Ioannis KONSTANTOPOULOS,
Libellant,

v.

DIAMANTE CIA. DE VAPORES, S.A. and THE SS BUENA FORTUNA, her engines, boilers, tackle and appurtenances, etc., Respondents.

United States District Court
S. D. New York.

Feb. 16, 1959.

———◆———

Jerome Golenbock, New York City, for libellant.

Zock, Petrie, Sheneman & Reid, New York City, for respondents, Edwin K. Reid, New York City, of counsel.

LEVET, District Judge.

This is an action brought by the libellant to recover damages for personal injuries allegedly sustained by him on July 11, 1957, while a member of the crew of the SS Buena Fortuna.

After hearing the testimony, examining the exhibits, the pleadings, briefs and proposed findings, this court makes the following findings of fact and conclusions of law:

Findings of Fact

1. The libellant, Ioannis Konstantopoulos, is a citizen of the Republic of Greece, where he resides and is domiciled.

2. At all times hereinafter mentioned, the respondent, Diamante Cia. De Vapores, S.A., was and still is a foreign corporation organized and existing under the laws of the Republic of Panama.

3. At all times hereinafter mentioned, said respondent owned, operated and controlled a certain merchant vessel known as the SS Buena Fortuna, which was a vessel documented and registered under the laws of the Republic of Liberia, flying the Liberian flag.

4. On or about May 24, 1957, the libellant was engaged by said respondent as a fireman aboard the SS Buena Fortuna under an employment agreement whereby libellant's basic wages were $117 a month plus overtime and found.

5. The libellant was serving aboard the aforesaid vessel on the 11th day of July, 1957, on which date the SS Buena Fortuna was on the high seas en route from a European port to Newport News, Virginia.

6. At or about and between 3:30 P.M. and 3:45 P.M. on July 11, 1957, the libellant was painting a certain ship's stairway or ladder at the forward end of the upper level of the engine room on the said ship and fell therefrom sustaining certain injuries.

7. Libellant has failed to prove by a preponderance of the evidence any unseaworthiness on the said vessel or in respect to the said ladder, stairway or otherwise which contributed to or caused such injuries as he received..

8. The testimony of the libellant as to what caused his injuries of July 11, 1957 is unreliable:

(a) His testimony that he was using a scaffold is not supported by other evidence; in fact, it is contradicted;

(b) No proof indicates exactly what happened to the scaffold, if it were indeed present when libellant says;

(c) The testimony of Duffy and Salem, hereinafter referred to, indicates that libellant may have fainted from heat and fallen;

(d) The testimony of the ship's engineers, Lemos and Zaholitis, who are believed by me, definitely demonstrates that the libellant said he fell from the ship's stairway on which he was then painting;

(e) The libellant's own testimony was confused and at times contradictory, with substantial variations between his statements in the examination before trial and that at the trial.

9. I further find that the libellant has not sustained the burden of proving by a fair preponderance of the evidence that any of the injuries sustained on board the SS Buena Fortuna on the 11th day of July, 1957 continued after July 31, 1957, or were responsible for any of the conditions of which libellant complained after his discharge on July 31, 1957 from the Riverside Hospital at Newport News, Virginia.

10. The libellant has offered no evidence to prove any sums expended or liabilities incurred for hospital or medical expenses, past, present or future; he has failed to prove that he is entitled to any maintenance and cure for any injury sustained or condition contracted or aggravated while on board the SS Buena Fortuna.

### Discussion

Libellant claims that he was injured while painting on the SS Buena Fortuna on July 11, 1957. He was a fireman on this ship, but in overtime did certain painting. On July 11, 1957, he began painting at about 1:00 o'clock, and continued until the time of this accident, which was 3:30 to 3:45 P.M. He testified that pursuant to orders he was painting the smoke stack while seated on a plank or scaffold, which was hanging by ropes attached; that these ropes were tied to rails next to vent holes on the ceiling. He said he was seated in the middle of the plank. He expressed the happening in substance as follows: "As I was painting, the plank got out of the rope or broke or whatever happened I don't know. I just fell down. The plank fell down too." Libellant stated that he did not look at the ropes either before or after the fall and there is no evidence that he looked at them during the course of any painting done from the scaffold.

There was no specific indication as to what, if anything, was wrong with the plank or scaffold, except that one Capt. William C. Ash testified that it was good seamanship to use scaffolds with horns or cleats fastened crossways to the planks with the ropes wound around or tied around these horns or cleats. There was nothing in the testimony of libellant to indicate exactly what had happened. There was no supporting testimony even to indicate that a scaffold was present.

Libellant testified that one of the wipers, a Peruvian named Chumacero, was working with him but had left the scaffold before the accident to see what time it was. Konstantopoulos stated that he was trying to move to the center of the scaffold without holding on to the rope, prodding himself along with his right hand. In his examination before trial, which in many respects differs from his testimony at the trial, he had testified that he was in complete exhaustion be-

cause of the heat and that he did not see the rope come off or break.

Libellant testified that the first thing he remembered after the accident was that he awakened at a hospital; that he was dizzy; there was blood coming out of his mouth and he had pains in the head and chest. He stayed at the hospital, which was the Riverside Hospital, Newport News, Virginia, for some twenty days. The ship did not arrive at Newport News until July 13th, two days after the accident.

Libellant has not worked since the accident. His wages on the SS Buena Fortuna were $117 a month, or $200 with overtime.

Constantinos Lemos, who was the second engineer on the SS Buena Fortuna at the time of the alleged accident, testified that he had ordered the libellant to paint the upper part of the engine room, to paint the steps, railings and sides; that there was no scaffold there on July 11, 1957, and that libellant started to paint at about 1:00 o'clock. Subsequently, and about 5:30 to 6:30, he saw libellant in his cabin and libellant said that he had fallen from the stairs and hurt his chest. Nothing was said about any injury to the neck or head, and libellant was not bleeding. Lemos said he knew of no witnesses and that there was nothing in the engineer's log about the accident.

Attempts were made to impeach Lemos. In a statement dated August 27, 1957 (Exhibit 8), no reference was made by Lemos to the conversation with libellant in his cabin. However, on May 29, 1958 (Exhibit I), Lemos did relate this incident. He said that the man who took the statement of August 27, 1957 (Exhibit 8) had not asked him what libellant had said about the accident.

Another witness, Constantinos Zaholitis, the third engineer on the SS Buena Fortuna, testified that he was on the 12–4 P.M. watch on July 11, 1957. Like Lemos, he testified that there was no scaffold in the area where libellant was painting; that about 3:30 P.M. on the platform in the engine room libellant came to him and said he had been hurt on the stairway and that his paint had spilled but that he had cleaned it up. Libellant was not bleeding and he did not mention a head injury. Zaholitis saw libellant in his cabin at about 5:00 that afternoon, and libellant made no mention of any injury to his head.

George J. Duffy, employed by the Turner Company, which represents the underwriters for the respondents, and who is a law school senior, testified that Isaac Salem, who was at that time the attorney for libellant, talked to him on October 2, 1957, either personally or by telephone, and that Salem said libellant had been asked to paint the boiler room and that he had fainted from intense heat and fell. This testimony was supplemented by that of Salem, who, when called by the respondents, testified that he discussed the case with Duffy and that he told Duffy that libellant had informed him that he had fainted on a scaffold and had fallen down. Salem remained the attorney for the libellant until March 10, 1957.

Two witnesses were called by the libellant in an attempt to impeach Lemos. One George Georguepolus testified that on January 21, 1959, at about 8:00 A.M. at a union office at the Hotel Flanders in New York City he overheard a conversation between libellant and Lemos in which in substance Lemos is asserted to have said: "I am sorry to hear about your epilepsy. I cannot tell the truth about what place you got hurt because I would lose my job." This witness had been involved in another accident and had a claim against another ship. This testimony is at best questionable since it appears that Lemos was no longer employed on the SS Buena Fortuna on the date of the alleged conversation.

It appears to me that this witness was endeavoring to assist the libellant in converting Lemos to the libellant's view of the accident.

Another witness produced by the libellant, Theodore Kontos, testified that he telephoned Lemos on January 20, 1959 in the evening and went with the libellant to

see Lemos at the Hotel Flanders. He stated that Lemos said to libellant: "I know that you fell off the scaffold but now I cannot do anything about it because four months after the accident happened I gave a deposition."

In his cross-examination Kontos gave varying versions of what he claimed Lemos said. It appears that Kontos was a close friend of libellant and apparently was attempting to influence respondents' witnesses, including both Lemos and Zaholitis, with whom he also talked.

There is substantial difference in the medical testimony, particularly as to whether or not the libellant suffered a skull fracture at the time of the alleged accident on July 1, 1957, or at any other time.

For the libellant, Dr. Philip Strax, a radiologist, took an X-Ray of the head and skull of the libellant on August 5, 1957, and testified that there was a 2″ lineal fracture in the right perital bone, but he was not able to fix the time of this fracture except that it was within six months prior to August 5, 1957. Thus, it may have occurred before July 11, 1957.

However, another radiologist, Dr. Henry K. Taylor, for the respondents, testified that he made an X-Ray of libellant's skull on January 8, 1959; that there was no evidence of a fracture; that the alleged fracture shown on the previous August 5, 1957 X-Ray was a venus channel.

This testimony, in turn, was challenged by the libellant, who called Dr. Irvin Balensweig, an orthopedic surgeon and not a radiologist, but who testified that on October 21, 1957 he showed the X-Ray of libellant's skull taken on August 5, 1957 by Dr. Strax to Dr. Taylor and that Dr. Taylor said he thought it was a fracture. This was prior to the time Dr. Taylor had taken a new X-Ray which apparently had convinced Dr. Taylor that there was no fracture.

I am definitely inclined to believe Dr. Taylor's opinion.

The medical testimony does not sustain the contention that epilepsy resulted from any injury on July 11, 1957:

(1) Dr. George B. Yulis merely stated that post-traumatic epilepsy was possible.

(2) Dr. Lawrence I. Kaplan, a neurologist, for the libellant, ascribed the blackouts to fainting attacks rather than epilepsy and conceded that the only objective symptom was a disturbance of balance and that the effect of subsequent accidents might alter his opinion.

(3) Dr. George S. Mitchell treated libellant at the Riverside Hospital, Newport News, Virginia, commencing on July 13, 1957, and continuing until discharged on July 31, 1957. Libellant complained, he said, of chest pains, nothing else; there were no cuts or lacerations or indications of bleeding; no evidence of fracture; no complaint as to the head or dizzy spells. Through a Greek interpreter, Dr. Mitchell took a history to the effect that libellant had fallen on the ship and struck his chest. Libellant was discharged on July 31, 1957.

(4) Dr. Fred Valergatis, a Greek-American physician who specializes in neurology and psychiatry, after examining libellant on November 4, 1957, testified at the trial that the syncope or fainting might well be from anxiety, tension or emotional upsets rather than trauma. In his opinion, neurological treatment or therapy of three to six months would cure libellant.

(5) Dr. Leon M. Weiss, a psychiatrist and opthalmologist, testified that he examined libellant on March 5, 1957, at the request of Isaac Salem, attorney for libellant in his action for an injury sustained by him on January 24, 1957 on the SS Andora. Dr. Weiss reported that a neuro-psychiatric evaluation was indicated, or, in other words, that libellant was either consciously or unconsciously malingering.

Libellant was in service in the Greek Army and was discharged in or about 1950 or 1951 for medical reasons, in particular, a stomach ulcer.

On or about January 24, 1957, libellant suffered an injury on the SS Andora, when hot oil entered his eyes, at which time he fell backward some five feet from a platform. (See testimony of Dr. Robert Richman.)

At various times, including December 26, 1957, Eastertime, 1958, and May 15, 1958, libellant claims to have suffered blackouts and fainting spells, which are supposed to indicate epilepsy or some other condition referrable to the alleged accident. He sustained a head injury when falling on steps at 132 West 47 Street, New York City, on December 26, 1957, and another head injury when falling on May 15, 1958 at a police station in New York City. There is also some indication of an automobile accident in which libellant was involved.

Even assuming the accident of July 11, 1957 to have happened in the way in which libellant states it happened, he has not shown by a fair preponderance of the evidence that the present injuries flowed from such accident rather than from a prior or later one.

With respect to Liberian law, which concededly is applicable here, the respondents, through a Liberian law expert, one Christian Abayomi Cassel, formerly Attorney General of Liberia from 1944 to 1957, introduced the four volumes of the Liberian Code of Laws of 1956, which were in effect as of July 11, 1957. The pertinent provisions of the Liberian law are set forth in the appendix hereto. Mr. Cassel testified that the only remedy which a seaman-employee has for damages against his employer for injuries sustained aboard a Liberian flag vessel on July 11, 1957 was a cause of action for unseaworthiness under the General Maritime Law of the United States, which in effect was bodily adopted by Section 30, Title 22 of the Liberian Code of Laws. Mr. Cassel also testified that libellant has no suit or cause of action for damages against his employer-shipowner or against the vessel on which he was employed based upon negligence under the laws of Liberia and, consequently, that the exclusive remedy of the injured seaman under the Liberian law is based on unseaworthiness.

## Conclusions of Law

1. This court has jurisdiction over the subject matter of this suit and of the parties thereto.

2. This action is governed by Liberian law.

3. Liberian law authorizes a seaman's action predicated upon unseaworthiness but not one predicated upon negligence.

4. No proof of unseaworthiness has been adduced.

5. No liability for maintenance and cure has been established.

6. No liability of any kind in favor of the libellant against the respondents has been shown for injuries sustained by the libellant on July 11, 1957.

7. The respondents are entitled to a dismissal of this claim with costs.

So ordered.

## Appendix

Pertinent provisions of the Liberian law are as follows:

Volume 2, Title 22: Maritime Law, Chapter 1, General: Construction:

"§ 30. *Adoption of general American Maritime Law.—*

"Insofar as it does not conflict with any other provisions of this Title, the non-statutory general Maritime Law of the United States of America is hereby declared to be and is hereby adopted as the general Maritime Law of the Republic of Liberia."

"§ 33. *Jurisdiction.—*

"All causes of action arising out of, or under, this Title are hereby declared and shall be cognizable before the Circuit Courts of the Republic, sitting in Admiralty, but, except as otherwise specifically provided in this Title, the provisions of this section shall not be deemed to deprive other courts, of Liberia or elsewhere, of jurisdiction to enforce such causes of action." * * *

Volume 2, Title 17: Injuries Law, Chapter 1, General:

"§ 1. *Injury defined.*—

"A tort or injury is an unlawful damage. Every act prejudicial to the interest of another is an injury unless it is warranted by law."

"§ 10. *Liability for injuries.*—

"Every person is liable for all injuries committed by him, subject to the exceptions stated in this section.

\* \* \* \* \* \*

"Every employer or principal is liable for the injuries committed by his agents or servants while employed in his business." \* \* \*

Volume 2, Title 16: General Construction Law, Chapter 3, Non-Statutory Law:

"§ 40. *Non-Statutory law: derivation.*—

"Except as modified by laws now in force and those which may hereafter be enacted and by the Liberian common law, the following shall be, when applicable, considered Liberian law: (a) the rules adopted for chancery proceedings in England, and (b) the common law and usages of the courts of England and of the United States of America, as set forth in case law and in Blackstone's and Kent's Commentaries and in other authoritative treatises and digests." \* \* \*

Volume 1, Title 6: Civil Procedure, Chapter 5, Actions:

"§ 165. *Actions for redress of a wrong other than a breach of contract.*—

"Actions for the redress of a wrong other than a breach of contract are classified as follows:

"(a) Actions of replevin, to recover possession of personal property wrongfully withheld by the defendant from the plaintiff.

"(b) Actions of ejectment, to recover the possession of real or immovable property wrongfully withheld by the defendant from the plaintiff.

"(c) Actions to recover damages for a wrong, in which the plaintiff seeks to obtain from the defendant a sum of money as damages or compensation for the injury he has suffered by reason of some wrongful act of the defendant. It may briefly be called an action for damages. *It is the action which lies for every injury for which there is no other remedy.*" \* \* \* (Emphasis supplied.)