Petros **PITSILLOS**, Libellant,

v.

**THE S/S GEORGE**, her engines, boats, tackle, etc., in rem, and **Puerto Seguro Cia. Nav. S.A.** of Panama, a foreign corporation or association, as owners, operators and agents of said vessel, in personam, Respondents.

No. 7863.

United States District Court
E. D. Virginia,
Norfolk Division.

Sept. 11, 1959.

Sidney H. Kelsey, Peter K. Babalas, Norfolk, Va., for libellant.

Seawell, McCoy, Winston & Dalton, John W. Winston, Norfolk, Va., for respondents.

WALTER E. HOFFMAN, District Judge.

While the S/S George was one day out of Gibraltar en route to Hampton Roads, Virginia, libellant, whose duties were that of galley boy or second cook, sustained an injury at approximately 6:30 A.M. on July 13, 1957, when he entered the galley and allegedly slipped on cook-

ing oil which had originally been on the stove and had, according to libellant, turned over, thereby causing the cooking oil to spill over the stove and its outer edges onto the floor. Libellant contends that he slipped and was caused to fall against the corner of a meat block in the galley, and that he sustained a serious injury to his left testicle which ultimately resulted in an operation to remove same.

The vessel was flying the flag of Liberia at the time in question and was owned by a Panamanian corporation. No testimony with respect to scrambled ownership is before the Court, and the law of Liberia controls the rights and obligations of the parties, other than as to the statutes relating to the payment of wages.

As libellant urges his right to recover under the principles of negligence and unseaworthiness, whereas respondent admits only the right to maintain an action for injuries resulting from an unseaworthy condition of the vessel, it would be necessary, if material, to consider the Liberian law which proctors agreed at the time of argument is correctly set forth in the appendix to Konstantopoulos v. Diamante Cia. De Vapores, S. A., D.C., 170 F.Supp. 662, 666, 667. It will be noted that the last cited case is in accord with respondent's contention that any right of action is limited to a recovery under the doctrine of unseaworthiness, whereas in Markakis v. Liberian S/S The Mparmpa Christos, D.C., 161 F.Supp. 487, it was held that the Liberian law permits a right of action under negligence, unseaworthiness, or both. In Markakis, however, no expert on foreign law testified, but in Konstantopoulos and in the instant proceeding a Liberian law expert expressed his views that any action was limited to that based upon unseaworthiness. Both of the foregoing cases are from the Southern District of New York. No determination is made as to the correctness of either decision for, as this Court believes, a cause of action based upon unseaworthiness may be sustained under the facts here presented.

There were no eyewitnesses to libellant's fall although one witness appeared on the scene as libellant was arising from the floor, at which time it was obvious that he was suffering acute pain in the groin. Following his confinement in bed, we find varied accounts of what libellant had related as occurring in the galley on the morning of the accident. The master stated, at the time of his first deposition, that libellant said he had bumped against the corner of a drawer; but when he again testified several months thereafter, the master gave libellant's version of the accident as having struck a doorway. Clearly, both statements are not correct and the force of the master's testimony is considerably weakened by this and other inconsistencies relating to the use of the galley during night hours and the responsibility for cleaning same.

All parties concede that it was the universal practice of the crew to visit the galley during night hours while no one was on official duty. This custom, although not followed on most vessels, was with the approval of the master and chief steward. The crew would make coffee, cook eggs, potatoes, etc. Cooking oil was frequently used in preparing the food. While no witness, other than libellant, testified as to the presence of any cooking oil on the stove or floor, much of the evidence is negative in character and the inferences from the testimony are such as to persuade that the occurrence of this essential fact (the presence of oil on the floor) was more likely or probable than its non-occurrence. This is all that is required by the term "preponderance of the evidence". United States v. Masiello, 2 Cir., 235 F.2d 279, 286. The libellant's testimony on this crucial point is positive; it is partially supported by his history given to the Public Health Service Hospital at the time of his admission, and prior to contacting any attorney; it is inferentially supported by the fact that the sea was rather calm on the morning of the accident, which makes a fall without cause highly unlikely.

Undeniably, libellant sustained an injury on the morning in controversy. The

issue relates to the cause and whether the condition constituted an unseaworthy condition. There is credible evidence to substantiate the contention that the galley, on occasions following the night visits of the crew, was sometimes left in an untidy and dirty condition. It is clear that no particular individual was charged with the duty of cleaning the galley following the night visits, and apparently this was left to the individual crew members without order or direction. None of the crew members assigned to the galley were on duty following the night meal, until it became time to prepare breakfast the next morning.

■■ Where a vessel and its owners permit the unlimited use of a galley for preparation of all types of food during night hours, with no crew member being assigned the duty of cleaning the galley following its use, if a slippery substance falls upon the floor and an accident occurs several hours thereafter as a result thereof, this can hardly be considered a transitory condition of unseaworthiness as expressed in Ross v. Zeeland, 4 Cir., 240 F.2d 820. As is suggested by Gilmore and Black, The Law of Admiralty, p. 332:

"Cases of 'transitory unseaworthiness'—soap, oil, grease, jello or what not on floor, deck or steps—might be regarded as 'normal perils of the sea', against which the owner does not insure, at least until someone has had time to clean up the mess. But the gradual disappearance from the unseaworthy cases of any requirement of notice, which the Boudoin opinion [Boudoin v. Lykes Bros. S.S. Co., Inc., 348 U.S. 336, 75 S.Ct. 382, 99 L.Ed. 354] highlights by not even discussing the point, suggests strongly that the owner's absolute liability for anything that can be called unseaworthiness, as distinguished from a peril of the sea, will not be affected by the fact that the condition arose during a voyage, whether at a port of call or on the high seas, and whether or not the condition came, or ought to have come, to the attention of the master or an officer before the accident."

Applying this logic to the present facts, it cannot be said that a galley, left in an untidy condition with no one charged with the responsibility of cleaning up, constitutes a condition which is a "normal peril of the sea". The failure to provide a safe place to work is, in this case, a breach of the warranty of seaworthiness. In so holding, the Court does not agree with libellant's proctor who argues that a mere transitory condition of unseaworthiness gives an absolute right of recovery. Poignant v. United States, 2 Cir., 225 F.2d 595.

Respondent argues the lack of proof in establishing that any can of cooking oil was found on the galley stove, or any oil spilled on the stove or floor, following the accident. A mess boy, interrogated along these lines, denied seeing anything of this nature, but admitted that he did not re-enter the galley for approximately 90 minutes after the accident and what he saw, or did not see, relates to that period. The master did not enter the galley after the accident; he endeavors to place the responsibility for good order in the galley upon a seaman on watch, but earlier in his testimony he stated that it was libellant's duty to clean the pots, pans and floor when libellant arrived in the galley early the next morning. The cook does state that the galley was clean at the time of his arrival, which was obviously after libellant was injured, and the cook further asserted that libellant advised that he had slipped and fallen against the meat block in an unknown manner. The chief steward declared that he made a cursory inspection of the galley after libellant's fall and that it was clean. He attributes this largely to the fact that the kitchen is always clean as the members of the crew realize that the galley will remain locked if it is not left clean. The chief steward's account of the galley's use by the night crew is as follows:

"In other vessels, on other vessels the kitchens are closed at night exactly to keep them from getting dirty. But I was asked by the crew

to please leave the kitchen open so that they could warm food to eat, they didn't want to eat cold food. And they all promised that they would keep the kitchen clean and therefore the kitchen was always clean every morning."

This narration is in conflict with other testimony given by the same witness where he averred that libellant's early morning duties were to clean any "pots, dishes, or spoons" left over from the night before. Manifestly no system was employed and no particular member of the crew was charged with the duty of cleaning the galley after night activities.

Finding a condition of unseaworthiness as a proximate cause of the injury sustained, we turn to the question of damages. Libellant was admitted to the United States Public Health Service Hospital on July 22, 1957, shortly after his arrival at Norfolk. His left scrotal contents contained a large varicocele, a condition which is a state of dilation of the veins. Initially he was given medication for pain and a scrotal suspensory was applied. Under normal conditions a varicocele exists with many males, but it is not ordinarily of a disabling nature. In the case of libellant, a varicocelectomy was performed which consists of the isolation of the various structures of the spermatic cord and the removal of the larger dilated veins in the cord. Libellant was discharged from the hospital on August 20, but returned on September 10 complaining of severe pain. He was readmitted on September 16 for removal of his left testicle which, according to the attending surgeon, was medically necessary [1].

It is clear from the testimony that a trauma ordinarily will not cause a varicocele, although it will tend to aggravate the pain temporarily. Subsequent to the varicocelectomy the continuation of pain in the scrotum could, assuming no pain prior to the trauma, be attributable to the trauma. When the testis was removed, the pathologist reported evidence of thrombosis (clotting) of the blood vessels, as well as the presence of a small hydrocele (excessive fluid) and some arteriosclerotic changes of the blood vessels in the cord leading to the testis. At no time was there any visible evidence of actual injury to the testicle apparent to the physicians or surgeons, but, of course, nine days had elapsed between the date of injury and his first medical examination. Additionally, it should be noted, the thrombosis could be the result of trauma and an injury could have given the chain of events that led to surgery and the removal of the testicle.

Libellant was again discharged from the hospital on October 7 following his second operation. He returned on October 23 and November 12, still complaining of pain. On December 12, he was re-examined with negative findings and declared fit for duty. Again in January and February complaints were registered and treatment administered, although in February he was seen by a neurological consultant. He was confined to the hospital from January 6 to February 21. His previous fit for duty status was modified during these months.

During a portion of the period that libellant was under the care of the Public Health Service Hospital, he was examined by a private surgeon on four occasions, namely, August 23, October 15, December 17, all in 1957, and on March 6, 1958. It was this surgeon's opinion that the varicocele was probably temporarily aggravated by trauma, and that the trauma had probably caused or aggravated additional injuries to the cord, which is the structure that runs to and around the testicle.

An expert urologist expressed his opinion, without the benefit of a personal examination but confined solely to a study of the medical and hospital records, that the continued pain was of the hysterical

---

[1]. Respondent emphasizes the fact that libellant requested the removal of the testicle. Conceding this to be true, it was not without cause and was deemed medically necessary by the surgeon in charge of the case.

type; that the pains were probably functional and unrelated to any physical disease or injury; and that the removed testicle was essentially normal, although other findings indicated a small hydrocele and some thrombosis in the blood vessels which, according to this witness, was caused by surgery. According to this expert, in rare instances a trauma may cause a varicocele.

The medical authorities are in agreement that a man with one good testicle may continue a normal life in every respect, including his ability to have normal sexual relations and fertility. As an interesting sidelight, it appears that on December 21–22, 1957, libellant and a woman registered as man and wife at the Atlantic Hotel, Norfolk, Virginia.

In summary, it is reasonably probable that the injury of July 13, 1957, aggravated the varicocele and the continuation of pain leads to the belief that trauma was associated with the pain. Even if the continued pain be in the nature of hysteria, this may well be connected with the trauma. The fact that, prior to July 13, libellant was physically fit in every respect lends support to the argument that his fall was a contributing cause to the ultimate removal of the testicle which, as indicated, was an operation performed by an expert who deemed such action medically necessary.

■ At the time of argument, respondent conceded that justification existed for the maintenance claim between December 12, 1957, and January 5, 1958, or a total of 25 days. The hotel bill was paid during this period but subsistence had been eliminated, presumably due to the fact that the hospital had declared libellant fit for duty. He was not reasonably fit for duty on December 12. During the entire time of his out-patient treatment he received $3 per day for subsistence and was apparently able to feed himself on that basis. Libellant will be allowed $85 by way of his claim for maintenance; said amount including interest.

■■ Any claim for cure fails as all medical and hospital bills were paid by respondent, other than that of Dr. Berger who examined libellant on four occasions but made no recommendation as to treatment. The general rule is that, where the employer provides reasonably competent medical attention, the seaman is not at liberty to increase the liability of his employer by seeking additional medical treatment without cause. Norris, The Law of Seamen, Vol. 2, § 592, p. 224.

■ Equally without merit is the assertion that libellant is entitled to the benefits of the two-for-one pay statute, 46 U.S.C.A. §§ 596, 597. Libellant contends that he demanded his wages from the master when sent to the hospital. This is denied by the master, but the master goes further and states that, in any event, the wages would not have been paid to libellant because of immigration laws prohibiting the "pay-off or discharge" of a seaman holding a D–1 landing permit, without the consent of the Attorney General. Sec. 256 of the Immigration and Nationality Act of 1952, 66 Stat. 223, 8 U.S.C.A. § 1286. While the provisions with respect to the "pay-off" of seamen have become considerably relaxed since United States v. Seaboard Surety Co., 4 Cir., 239 F.2d 667, the precise question involving a seaman being sent to the hospital was not presented. Certainly, however, the master, not being conversant with American law, should not be subjected to a possible violation of the wage statute where the wages were left with the agent and thereafter tendered to libellant upon his discharge from the hospital. There is no claim that libellant needed funds while in the hospital and, as his period of initial confinement was of brief duration, the offer of wages without penalties made immediately upon his discharge is sufficient to convince the Court that, in its discretion, no penalty should be inflicted. Evidence as to alleged unpaid overtime wages due libellant is too vague even to consider.

■ Wages were lost from July 22, 1957, until approximately April 15, 1958, at $70 per month. That libellant's own negligence contributed to the accident can scarcely be disputed as, according to his

own admission, he observed the cooking oil spilled on the stove and its outer edges. In the discharge of reasonable precaution for his own safety, he should have anticipated that some of the oil may have reached the floor. This he failed to do.

For such portion of the pain, suffering, mental anguish and permanent injury as may reasonably be attributable to the trauma, together with the loss of earnings, libellant is entitled to an award of $6,000. This amount will be reduced by one-third chargeable to libellant for his contributory negligence. To the net award of $4,000 should be added maintenance in the sum of $85, an item which is not reduced by libellant's own negligence.

A decree will be entered in accordance with this memorandum.