David E. JORDAN, Libellant,

v.

NORFOLK DREDGING COMPANY, a corporation, in personam, Respondent.

No. 8376.

United States District Court
E. D. Virginia,
Norfolk.

Oct. 31, 1963.

Henry E. Howell, Jr., Howell, Anninos & Daugherty, Norfolk, Va., for libellant.

Guilford D. Ware, Baird, Crenshaw & Ware, Norfolk, Va., for respondent.

MICHIE, District Judge.

This libel was brought by David Earl Jordan against the respondent, Norfolk

Dredging Company, for maintenance and cure allegedly due him as a result of injury to his back sustained while working as a deckhand on respondent's tug the *John T. Gibbs*. Although many of the facts involved in this case were hotly contested by the parties, the court finds them to be as follows:

In February of 1962 Jordan signed on as deckhand aboard the tug *John T. Gibbs*. He remained with the *Gibbs* until September 14, 1962, when his employment with respondent was voluntarily terminated in a manner that will be described later. During his employment aboard the *Gibbs* his regular work schedule consisted of two weeks aboard the tug working twelve hours per day in six hour shifts, followed by one week of vacation during which he usually returned to his home in eastern North Carolina. In April or May of 1962 (Jordan was confused as to which month) while doing some cooking for the tug's crew, Jordan's foot slipped out from under him as he stepped across the raised coaming at the door leading into the kitchen. As he tried to keep himself from falling, he twisted his back which gave an audible snap, leaving him feeling weak and with a dull ache in his back. He lay down on the fantail of the tug for a while and while there told the vessel's relief captain, Hughie Williams, that he had hurt his back. The mishap, however, was never put in the tug's log or reported to the respondent's office. Since he was coming off watch at the time Jordan went on down to his bunk and went to sleep.

He testified that this mishap left him with a dull ache in his back which became more intense when he undertook any heavy lifting. However, he was able to continue to do the work required of him on the tug since his fellow deckhands helped him whenever possible when heavy lifting was involved. In an attempt to get some relief from the pain in his back Jordan sought, during his regular time off, the services of a chiropractor in Washington, North Carolina, by the name of Dr. Engelhardt, incurring a total bill of $63.00 for eight visits in May, June, July and August. The last visit to Dr. Engelhardt took place on August 2, 1963. Jordan testified that at times Dr. Engelhardt's therapy gave him temporary relief but that the pain always returned.

On the night of August 11th or early in the morning of August 12th Jordan was engaged with another deckhand in transferring five oxygen cylinders weighing around 100 lbs. each from an empty mud scow onto a derrick barge whose deck was seven or eight feet below that of the mud scow. In this operation Jordan stood on the derrick barge and his fellow deckhand passed the cylinders down to him one by one. As the last cylinder was passed to him, Jordan lost his footing and fell against the iron railing which surrounded the derrick barge, skinning his right leg and elbow, bruising his hip and twisting his already weakened back once more. After this accident the pain in his back became more acute and radiated down into his right leg. Jordan testified that it was even more difficult for him to work after the August accident, but the continuing help of the other deckhands coupled with the fact that the *Gibbs* was on "standby" during August and early September enabled him to get by.

On September 14th the *Gibbs* finished the contract work to which she had been assigned and was tied up. Her crew was offered work on Norfolk Dredging Company's yard. Jordan declined the offer because of the pain in his back, knowing that work on the yard required continuous lifting, and his employment with the respondent was terminated. There was no indication in the evidence that he told any official at Norfolk Dredging why he declined to work on the yard. He then returned to his home in Bath, North Carolina.

As has already been stated, no report of the first mishap suffered by Jordan aboard the *Gibbs* was ever made to Norfolk Dredging Company's office. However, an entry was made in the tug's log regarding the August injury which read: "1:50 David skinned leg." In addition,

a more complete report dated August 31, 1962 was made out and sent to respondent's insurance carrier, United States Fidelity and Guaranty Company. This report described the accident and the injury by saying:

> "Employee was moving a gas bottle from scow #53 to the derrick when he slipped and hit his right leg on rail, causing a skin just below the knee. Bruised also. * * *
>
> "Skinned right leg just below the knee."

Since the report did not appear to deal with anything more than a minor mishap, U. S. F. & G. took no action on it until about October 18, 1962, when a registered letter was received by Norfolk Dredging Company from Jordan, stating that his August accident had proved to be more serious than he had originally thought it was and that he wanted to get his "workmen's compensation" straightened out as soon as possible. A letter dated October 16, 1962 was also sent to Norfolk Dredging Company from Dr. Clark Rodman stating that Jordan was suffering from a ruptured intervertebral disc and would be operated on shortly after October 24, 1962 at the Veterans Administration Hospital in Durham, North Carolina. Both these letters were forwarded to U. S. F. & G.'s claims manager, Victor Haake, who immediately telephoned Jordan and arranged for him to come to Norfolk at the company's expense to talk the matter over, which he did within a few days.

The upshot of this meeting was that Haake, on the basis of such information as he had, was, to say the least, doubtful that Jordan's complaints, if real, were caused by any injuries suffered while he was in the employ of the Dredging Company and that consequently he was probably not entitled to maintenance and cure. So Haake encouraged Jordan to return to North Carolina and enter the V. A. Hospital in Durham. In this respect I have concluded that Haake erred, as I believe from the evidence that Jordan was injured while employed by Norfolk Dredging and was entitled to maintenance and cure.

Jordan entered the V. A. Hospital in Durham, North Carolina on October 24, 1962 and remained there until November 4, 1962. The medical results of that stay are equivocal. While at Durham Jordan was given a myelogram, which is acknowledged to be the best diagnostic test for establishing the presence of a herniated disc. The test showed only a "questionable defect," and since it was felt that "the patient's problem was primarily non-organic in nature," libellant was released "with no follow up indicated." The libellant did not seek further medical attention until April 2, 1963, when he was sent to Dr. John S. Thiemeyer by the attorneys he had employed to represent him in asserting his seamen's rights. Dr. Thiemeyer felt that Jordan was indeed suffering with a ruptured disc and that further studies should be done on him. This statement prompted Victor Haake to tender a check for $90.00 "without prejudice" to Jordan which was to cover the period from October 9, 1962, when Dr. Rodman first saw Jordan, until October 24, 1962, when Jordan entered the V. A. Hospital.

Since Jordan alleged continuing pain in his back he was admitted to the Norfolk General Hospital on June 17, 1963 and remained there until June 27, 1963 under the care of Dr. James L. Thompson, a prominent orthopedic surgeon in Norfolk. Another myelogram was administered during this time. This one was completely negative, and Dr. Thompson released Jordan from the hospital saying, "My impression was that this man does not have evidence of a ruptured disc in his spinal canal at this time. I could find no evidence of any neurologic disability at this time." His testimony at the trial of this matter was substantially the same.

Jordan, still suffering periods of acute discomfort, was again admitted to the Norfolk General Hospital on August 19, 1963 and remained hospitalized until about August 24, 1963 under the care of Dr. John Vann, Dr. Thompson being

on vacation. Dr. Vann could find no medical explanation for Jordan's symptoms and felt he should go back to work. He testified to that effect at the trial.

However, Dr. Thiemeyer testified at the trial, after having seen Jordan several times, that he was still of the strong opinion that Jordan had a herniated disc. He stated that the myelogram was not a 100% perfect test, to which both Drs. Thompson and Vann agreed, and felt that the other tests he administered definitely pointed to a herniated disc. He stated that Jordan was neither fit for duty, nor had he reached a state of maximum cure. He testified that he would first prescribe "conservative" treatment, which would consist of putting Jordan in the hospital in continuous traction for a number of weeks, to be followed up by two or three months in a plastic jacket. If no relief was obtained, then he would try an exploratory operation to find out exactly what was wrong.

■ Faced with this conflict of medical evidence, this court resolves it in favor of Dr. Thiemeyer and finds that the libellant was injured aboard the tug *Gibbs*, that he is not yet fit for duty, and that he has not yet attained a state of maximum cure. This court must therefore conclude that maintenance at the rate of $6.00 per day is owed libellant from September 14, 1962, excluding the period from October 9, 1962 to October 24, 1962, which already has been paid, and the three intervening periods of hospitalization and that further maintenance and cure is due Jordan to bring him to a state of maximum cure or to make him fit for duty once more.

■ The legal import of Haake's treatment of Jordan at their meeting in Norfolk is the subject of much controversy in this case, with libellant's attorney making a forceful argument that Haake was "callous" (see Vaughan v. Atkinson, 369 U.S. 527 at 530, 531, 82 S.Ct. 997, at 999, 8 L.Ed.2d 88 (1962)) (a) in allowing Jordan to return to North Carolina and enter the V. A. Hospital at Durham at no expense to Jordan on October 24th as he had already made

plans to do, (b) in not fully explaining to Jordan the nature of his right to maintenance and cure, and (c) in not immediately undertaking to pay Jordan maintenance from the time his employment terminated at Norfolk Dredging Company. For a number of reasons which need not be enumerated here, this court has grave doubts that there was any callous behavior whatsoever on the part of U. S. F. & G. or Norfolk Dredging Company toward libellant in the case at bar. But there is no doubt but that Haake's decision resulted in Jordan being required to employ attorneys to bring this action to require the respondent to pay for his maintenance and cure while incapacitated as a result of his injury. And, as this court reads the Supreme Court's opinion in Vaughan v. Atkinson, supra, whether there was callous behavior or not makes no difference in the determination of whether counsel fees should be awarded to a seaman who is forced to bring suit to collect his maintenance and cure; and, of course, it is in any event immaterial with respect to his right to maintenance and cure. For the Supreme Court in Vaughan in awarding counsel fees as "damages" or "necessary expenses" expressly rejected an award of counsel fees based on unconscionable behavior by the shipowner and likewise rejected, as Mr. Justice Stewart's dissent points out, the award of exemplary damages for wanton and intentional disregard of the seaman's legal rights. The language of the majority opinion reads as follows (369 U.S. at 530, 82 S.Ct. at 999, 8 L.Ed.2d 88):

"Our question concerns damages. Counsel fees were allowed in The Apollon, 9 Wheat. 362, 379 [6 L.Ed. 111], an admiralty suit where one party was put to expense in recovering demurrage of a vessel wrongfully seized. While failure to give maintenance and cure may give rise to a claim for damages for the suffering and for the physical handicap which follows (The Iroquois, 194 U.S. 240 [24 S.Ct. 640, 48 L.Ed. 955]), the recovery may also include

'necessary expenses.' Cortes v. Baltimore Insular Line, 287 U.S. 367, 371 [53 S.Ct. 173, 77 L.Ed. 368]."

Apparently the Supreme Court intended to put shipowners on notice that if, in *any* case, they saw fit to contest a claim for maintenance and cure, regardless of the reasonableness of the grounds upon which the refusal to pay was based, and if it was ultimately determined on the merits that maintenance and cure was indeed owing, then counsel fees should be paid as compensation for "necessary expenses" incurred. In other words, attorneys' fees have been made a routine element of damages to be paid any seaman who wins a contested maintenance and cure suit. Apparently this added and unusual onus is put on the shipowner's shoulders in maintenance and cure actions in an attempt to equalize the always poor and usually ignorant seaman with the powerful, wealthy and well informed shipping company which is better able to evaluate the legal merits of a claim and to pay the, to them, relatively small amounts usually involved in maintenance and cure actions.

I must admit that the Vaughan opinion is far from clear and the Supreme Court does use language which refers to the "callous", "recalcitran(t)" and "willful and persistent" behavior of the shipowner in that case.[1] But in the light of the legal authority upon which the Supreme Court rests its decision and the statement above quoted, this language cannot be read as indicating that the right to recover counsel fees turns on whether or not the shipowner was "callous." Certainly in Sims v. United States of America War Shipping Administration, 186 F.2d 972 (3d Cir. 1951), cert. denied, 342 U.S. 816, 72 S.Ct. 31, 96 L.Ed. 617 (1951), the shipowner was not permitted to justify its non-payment of maintenance and cure on the ground that

it had a good faith defense to the claim and was ordered to pay consequential damages occasioned by the failure to provide maintenance and cure when it was demanded. In so holding, the court stated (186 F.2d at 974):

"The court found that there was nothing to show that the respondent's position was not taken in good faith. We take it that the respondent thought that Sims was a malingerer or liar, or both, and that his claim was fraudulent. We do not think this lack of bad faith saves the respondent from liability. If Sims was not entitled to money for maintenance and cure of course respondent did not have to pay it. But it has been found, and we approve the finding, that respondent is responsible for maintenance and cure in this case. Since by this finding it is established that respondent has been under a duty to provide the maintenance and cure all along, the fact that it did not show bad faith in denying liability does not relieve it from payment. Nor should it relieve it from payment of consequential damages."

As I read the Vaughan case, counsel fees have now been brought within the sphere of consequential damages in maintenance and cure actions. And therefore all I need to determine is that maintenance and cure was owed. That being the case, payment of such counsel fees as had to be paid in order to collect the amount due became an automatic obligation of the shipowner in the same manner as compensatory damages for aggravated injury due to non-payment of maintenance and cure is an automatic obligation.

Accordingly, libellant's counsel fees amounting to one-third (⅓) of Jordan's total recovery are to be paid by respond-

[1] "In the instant case respondents were callous in their attitude, making no investigation of libellant's claim and by their silence neither admitting nor denying it. As a result of that recalcitrance, libellant was forced to hire a lawyer and go to court to get what was plainly owed him under laws that are centuries old. The default was willful and persistent. It is difficult to imagine a clearer case of damages suffered for failure to pay maintenance than this one." Vaughan v. Atkinson, 369 U.S. 527 at 530, 531, 82 S.Ct. 997, at 999, 8 L.Ed.2d 88.

**84**

ent as well as the following other "necessary expenses":

1) Dr. John Thiemeyer, court appearance—$150.00;

2) V. A. Hospital—copy of medical abstract—$23.00;

3) Attendance fees for witnesses in court—$16.80.

An Order will be entered accordingly.