**Melvin A. CONNORTON**

v.

**HARBOR TOWING CORPORATION.**

**No. 4603.**

United States District Court
D. Maryland.

Dec. 31, 1964.

Bernard M. Goldstein, Baltimore, Md., for libelant.

Randall C. Coleman, Manfred W. Leckszas, and Ober, Williams & Grimes, Baltimore, Md., for respondent.

NORTHROP, District Judge.

Melvin A. Connorton (Connorton), a tugboat engineer, brought this libel against Harbor Towing Corporation (Harbor) because of an injury he sustained when he slipped and fell, striking his chest against a quarter bitt, while on Harbor's Tug INDIAN. This blow, he claims, activated a dormant tubercular condition.

Connorton contends:

1. The INDIAN was unseaworthy because

    a. ice was on the deck;

    b. a tow strap parted; and

    c. the INDIAN was undermanned.

2. Harbor was negligent in allowing ice to accumulate on the deck even though at sea, and in using a tow strap which it knew or should have known was defective.

3. Harbor should pay maintenance for 118 days from April 19, 1962, to August 16, 1962; 135 days from April 24, 1963, to December 31, 1963, less the period of June 15, 1963, to September 21, 1963; or a total of 253 days.

This opinion contains the Findings of Fact and Conclusions of Law in accordance with Rule 46½ of the Admiralty Rules.

Connorton was employed as the engineer on the INDIAN on March 17, 1961, when the accident occurred. The INDIAN was towing the oil barge MP 23 on a run from Baltimore to Annapolis. The barge was secured abeam by the use of a bow line, a tow strap or a double quarter line, and a stern line. All of the lines used in rigging the barge were five-inch manila lines. The bow and stern lines were rigged singly. The double quarter line, or tow strap, extending from the INDIAN's forward portside quarter bitts aft to a cleat on the quarterdeck of the barge, was rigged with a bight which had the effect of doubling its strength.

At the time the tow strap parted, Connorton, having been "rung off" by Captain Sammons, was on the bridge giving him a cup of coffee. Immediately, the captain ordered him below to cut off his engines. Connorton quickly set off to do so and while rounding the wheelhouse he slipped, fell on a patch of ice, and landed on his chest against the quarter bitts on the deck. He then made his way to the grate over the engine room and stopped the engines from above. Feeling sick from the blow, he went to the engine room and remained there.

The deckhand then reversed the tow strap, discarded the broken portion and relashed the remaining piece. This rope was used for the rest of the voyage to Annapolis without any further mishap. On reaching Annapolis, Captain Sammons telephoned Harbor's office in Baltimore and spoke with a Mr. Keller, the manager, informing him of the accident. Connorton returned to Baltimore with the vessel which then lay in her berth from the evening of March 17 until March 21, 1961. Connorton had an opportunity to procure medical attention but did not. The INDIAN began another trip on March 21 which lasted until April 1. Connorton was engineer but continued feeling ill during this period. On April 4, 1961, when the INDIAN was again in Baltimore, he requested and obtained a Master's Certificate of Service from Harbor. The following day he went to the United States Public Health Service Hospital in Baltimore, reporting to the outpatient clinic, and had X-rays taken of his chest.

On April 6, 1961, Connorton was admitted as an inpatient. The X-rays taken the previous day showed a lesion in the upper part of the right lung. The admitting physician, Dr. Weller, made this notation regarding Connorton's condition:

"Lungs—TB (none reported on previous films, so must assume this to be active).

"Admission diagnosis: pulmonary tuberculosis?"

Connorton remained in the hospital for over a month until May 11, 1961. During his stay more X-rays were taken; in addition, bronchoscopy specimens were taken and gastric washings done. And the patient also had bacteriological culture studies done to sputum specimens taken from him. These tests were all negative. Connorton was discharged on May 11, 1961, with the notation, "Undiagnosed disease of lung. * * * He was discharged not fit for duty indefinitely. * * *" From the testimony at the trial, it seems that somehow a fit-for-duty slip was given to Connorton, because on May 15, 1961, he returned to work for Harbor. On June 6, 1961, he was marked "fit for duty" by the hospital; the results of the culture tests came back negative.

Though deemed fit for duty by the hospital, on June 6, 1961, still, outpatient

appointments were scheduled with the United States Public Health Service Hospital for July and August. Connorton canceled the first two appointments and failed to respond to the notice of the third. The evidence indicates that: he was present in Baltimore on the two dates scheduled in July and he canceled each appointment; and he failed to respond to the notice of the August appointment although he was in Baltimore two days after it was mailed.

Connorton continued to work for Harbor until April 19, 1962, when he was fired for allowing the engine of the tug FISHER to burn up. After a period of heavy drinking, he reported to the United States Public Health Service Hospital on April 26, 1962. A chest X-ray was taken at this time, and though this one was read negatively, a later correct reading did show an active tuberculosis over a year after his injury. This later reading and medical examination were made by Dr. Moses I. Shiling on July 31, 1962. Subsequent to this correct interpretation of his condition, he returned on August 16, 1962, to the Hospital with a case of moderately advanced pulmonary tuberculosis. He was transferred to Mount Wilson State Hospital on August 21, 1962, to receive more specialized care for the treatment of tuberculosis. Connorton remained in Mount Wilson until April 24, 1963, when he left of his own accord. All medical testimony agrees that as of then he had received maximum cure.

Connorton again returned to work for respondent on June 10, 1963, as mate of the tug SADIE and he continued working until September 1, 1963, when he was fired for drinking. This libel was filed on October 31, 1963.

## ICE ON THE DECK

The cases cited to support unseaworthiness because of snow or ice on the deck are all distinguishable on one major point: in none was the vessel at sea; all were docked in port. Pacific Far East Lines, Inc. v. Williams, 234 F.2d 378 (9 Cir.1956); Mercado v. United States, 184 F.2d 24 (2 Cir.1950). As a practical matter, it would be impossible to maintain an ice free deck while operating at sea in freezing weather where the slightest ocean spray can create sheets of ice on deck. Connorton contends that rock salt is generally available to be applied to ice, making it less slippery. Again, this is true but this is done to vessels which are stationary and tied up in port. The testimony at trial was that sand or rock salt would have washed to the center of the ship because of its canted decks. Thus, ice would have again formed over any area of the deck where the spray might hit except that very narrow area confined to where the deck and the housing on the deck meet. Given the freezing weather and the inevitability of ocean spray, the INDIAN and her decks were reasonably fit for the purpose for which they were to be used. Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 80 S.Ct. 926, 4 L.Ed. 2d 941 (1960); Michalic v. Cleveland Tankers, Inc., 364 U.S. 325, 81 S.Ct. 6, 5 L.Ed.2d 20 (1960). I conclude that the INDIAN was seaworthy with respect to the ice on deck while at sea.

## PARTING OF TOW STRAP

Was the tug INDIAN unseaworthy because the tow strap which parted was defective? Unseaworthiness imposes a kind of liability totally devoid of concepts of fault; it is necessary, therefore, to determine only that it exists. Mahnich v. Southern S. S. Co., 321 U.S. 96, 64 S.Ct. 455, 88 L.Ed 561 (1944). And the duty to provide a seaworthy vessel has long been held to be absolute. Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946).

In order to determine whether the tug INDIAN was unseaworthy on March 17, 1961, it is first necessary to determine whether the parting of the tow strap occurred because it was not reasonably fit to tow the barge. I am not able to say, with absolute confidence, that the rope parted because it was rotten, worn, improperly woven or defective in some other way. The shorter of the

two remaining pieces was discarded after the parting; the longer was relashed and used and presumably discarded when its usefulness ended. I, therefore, have no direct evidence of the condition of the rope either at the point where it parted, or at the time it parted.

The rope was being used in a proper manner and was properly secured to both the tugboat and the barge. The logical inference, then, is that the rope parted because it was defective, or, in other language, that it was unseaworthy. Petterson v. Alaska S. S. Co., 205 F.2d 478 (9 Cir.1953); affirmed 347 U.S. 396, 74 S.Ct. 601, 98 L.Ed. 798. To distinguish Petterson from the situation on the INDIAN, Harbor cites language from page 479 of the Court of Appeals opinion:

> "There was no proof as to the condition of the block prior to its use other than what may be implied from the accident."

Harbor then contends that in the present case there is some proof. This might be so, but it is too narrow a reading of the case to say that only where there is *no* proof of any kind can the logical inference of unseaworthiness be made. Rather, given an unexplained accident of this kind, the proof necessary to rebut what otherwise becomes a presumption of unseaworthiness, must be convincing proof. I am not convinced that because new rope had been bought by Harbor within six weeks prior to the accident and because a portion of the rope had been used subsequently without mishap, it is then not logical to infer that the rope, at the point where it parted, was defective. Nor can Harbor's kind of proof shift to Connorton the burden of presenting evidence to show affirmatively the defective condition of the rope.

In the case of Titus v. The Santorini, 258 F.2d 352 (9 Cir.1958), the preventer wire which broke was retained and examined. (Apparently in Titus neither counsel nor the court gave much attention to the rope guy which broke at the same time.) The proof as the result of examination was that the wire was not defective. The Court of Appeals, hypothesizing, conceded that there were other possibilities which might have rendered the ship unseaworthy, but held that the conclusions of fact made by the trial court, given substantial and convincing proof of seaworthiness, were not clearly erroneous.

Taking a look at its prior decision in Petterson v. Alaska S. S. Co., supra, the Court of Appeals was impressed with the fact there was no proof as to the block's condition. Again, the proof here is likewise of no help in ascertaining what the condition of the rope actually was at the time it broke and at the point of separation. The court in Titus further said that the inference made in Petterson was permissible in light of its facts. The inference then is deemed both logical and permissible. And the logic of the conclusion and the permission to so conclude are not necessarily antagonistic. On the contrary, they coexist rather well. The logic, for its part, remains constant. At most, then, the permissibility to reach the conclusion might be taken away because of a new rule of law upsetting the tenability of one of the premises for the logical syllogism.

I find that Titus v. The Santorini is not authority for precluding a ruling in favor of Connorton on unseaworthiness. I further conclude that because of its special facts, the rulings made by the trial court there could not be made here. Finally, that the trial court or the court of appeals might have remained puzzled as to the precise cause of the accident in Titus does not make a finding of seaworthiness illogical. On the contrary, the evidence gathered in Titus tended to prove that the preventer wire broke because of a momentary excessive strain: on examination it was found to be devoid of wear, corrosion, brittleness or any other defect, Titus v. The S. S. Santorini, D.C.Or., 152 F.Supp. 63 (1957). I may then say that Harbor here is without the helpful fact findings which respondent had in Titus. I conclude that the

INDIAN was unseaworthy because of the tow strap.

Having found that the INDIAN was unseaworthy, it is unnecessary to determine whether Harbor was negligent with respect to providing and handling the rope.

### UNDERMANNED VESSEL

██ Connorton was unable to prove that the INDIAN was undermanned on its trip from Baltimore to Annapolis. In fact, all of the testimony was to the contrary. A four-man crew constituted the INDIAN's normal complement for voyages which, like the trip to Annapolis, last less than six hours. There is no suggestion of evidence to connect the alleged undermanning with the accident. I, therefore, cannot find unseaworthiness and/or negligence on this contention.

### THE INJURY AND TUBERCULOSIS

██ Was the blow to Connorton's chest brought about by the parting of the tow strap a proximate cause of his tuberculosis one year later?

I deny liability because I cannot find that libelant's tuberculosis was activated by the blow he received to his chest on March 17, 1961. Certainly, Sentilles v. Inter-Caribbean Shipping Corp., 361 U.S. 107, 80 S.Ct. 173, 4 L.Ed.2d 142 (1959), is authority for a finding that trauma of the kind Connorton received can activate tuberculosis and for the proposition that the trier of fact may so find even where there is conflicting testimony. The proposition is well taken. However, the Sentilles case is quite different from that at hand. Sentilles did receive a blow very similar to that of Connorton, but it was determined as shortly as three weeks after the accident that Sentilles had an active case of tuberculosis. Here, even eight weeks after Connorton's injury, all tests made to ascertain an active case of tuberculosis *were negative.* As of May 11, 1961, there remained only the findings of the sputum culture tests. After the proper period these, too, were found to be negative. Connorton's medical experts urge that they would have conducted further, more extensive examinations. I do not speculate as to what these examinations might have revealed.

Connorton also makes a point that the notation on the hospital records on May 11, 1961, when he was released, indicate an undiagnosed disease of the lung. (He was therefore deemed "unfit for duty".) But the discharge notations also stated, "After obtaining numerous negative smears the patient was removed from isolation and permitted full ward activity. He had no symptoms throughout the hospital stay." When the culture tests were done on June 6, 1961, the hospital officially noted that Connorton was "fit for duty". It would have been poor medical practice to diagnose the lung condition as not being tuberculosis on May 11, 1961, when a major test remained to be concluded. Nor could the hospital doctor say that what was originally assumed to be active tuberculosis was still tuberculosis when all other tests resulted in the negative. Acting cautiously, a disease was still assumed to exist; taking note of the tests performed it was described as undiagnosed, still allowing for the possibility of tuberculosis should the sputum test result positively. It did not. The conclusion, viewing the hospital records, then, is that Connorton did not then have an active case of tuberculosis. Neither can we find that the trauma produced a delayed reaction and that the tubercle bacilli broke out after May 11 as a result of the blow.

Another point brought out by the expert medical testimony on both sides is whether trauma to the chest can and often does activate pulmonary tuberculosis. Only if I strongly believe Connorton's experts to the point of concluding that trauma *always* activates a dormant tubercular condition could I overlook the evidence contained in the hospital records. And I do not so believe. It is not really necessary to make a determination of the likelihood of activation in this type of case, but I tend to accept the view of Harbor's expert that trauma does not frequently activate pulmonary tuberculosis.

Returning to Sentilles, that case is distinguishable on more than its facts. There the initial finding by the jury was for the injured party. The Court of Appeals reversed, holding that the jury could not properly find for libelant given all of the testimony, including the (conflicting) medical testimony. Inter-Caribbean Shipping Corp v. Sentilles, 256 F.2d 156 (5 Cir.1958). The Supreme Court then reversed the Court of Appeals holding that the jury could reasonably have found for Sentilles as it did. The Supreme Court added that the Court of Appeals should not have re-evaluated the evidence in the case simply because the jury could have reached another result which the latter court thought more reasonable. The Supreme Court's opinion, then, in Sentilles is not really persuasive of the proposition that the trier of fact at the outset is to have any predisposition regarding the cause of the activation of the tuberculosis.

Connorton worked continuously for over one year after the incident complained of, which, considering his work record, was a long time.

To repeat, I must conclude that the trauma Connorton received one year prior was not a proximate cause in activating his tuberculosis.

## MAINTENANCE

■ Connorton claims 118 days maintenance from April 19, 1962, through August 16, 1962, and 135 days maintenance from April 24, 1963, through December 31, 1963, less the period he worked between June 15, 1963, through September 21, 1963.

On April 19, 1962, Connorton was fired for allowing the engine of the tug FISHER to burn up. He was not fired or discharged due to any illness. Prior to being fired, he had worked steadily with Harbor since May 15, 1961, and had been considered "fit for duty". Further, he was not in Harbor's employ when he reported to the United States Public Health Service Hospital on April 26, 1962, for stomach complaints following a period of drinking. But Connorton's illness was contracted *during* the period he was employed by Harbor. To repeat, I have found that the illness was not the result of, nor proximately caused by, the blow he received on March 17, 1961. Furthermore, I cannot find, on the basis of the evidence, that his illness was somehow connected with his employment. And since he became ill while he was working for Harbor, the fact of the firing or the particular reasons therefor do not warrant withholding maintenance and cure. Farrell v. United States, 336 U.S. 511, 69 S.Ct. 707, 93 L.Ed. 850 (1949); Dragich v. Strika, 309 F.2d 161 (9 Cir.1962). See also Gilmore and Black, The Law of Admiralty, page 260, and Norris, The Law of Seamen 2d, Vol. I, §§ 549 and 562. I find, therefore, that Connorton is entitled to 118 days maintenance and cure at the rate of $8.00 a day, for a total of $944.00. I find that Connorton made no claim prior to the institution of this law suit for maintenance and cure. I further find that there has been no withholding nor any default, willful or otherwise, of maintenance and cure within the meaning of Vaughan v. Atkinson, 369 U.S. 527, 82 S.Ct. 997, 8 L.Ed.2d 88 (1962). Therefore, I can impose no penalty. Connorton's recovery is limited to the sum mentioned above.

■ From August 17, 1962, through April 23, 1963, Connorton received free hospital care. He is therefore not entitled to maintenance and cure for this period. Calmar S. S. Corp. v. Taylor, 303 U.S. 525, 58 S.Ct. 651, 82 L.Ed. 993 (1938); Norris, supra, § 593.

■ Furthermore, the evidence conclusively showed that when Connorton left the Mount Wilson hospital on April 23, 1963, he had reached his maximum state of cure. The hospital notation states that Connorton left "against medical advice". But the uncontradicted testimony, including Connorton's, was that he had attained maximum cure. I do not, therefore, award Connorton maintenance and cure for the period from April 24, 1963, through December 31, 1963. Farrell v. United States, supra;

Carleno v. Marine Transport Lines, Inc., 317 F.2d 662 (4 Cir.1963); Norris, supra, § 561.

Therefore, an appropriate order will be signed upon presentation by counsel for the libelant.