**Saturnino Lima DIAZ, Plaintiff,**

v.

**GULF OIL CORPORATION, Defendant.**

United States District Court
S. D. New York.

Jan. 15, 1965.

**262**

Henry Isaacson, New York City, for plaintiff; Theodore H. Friedman, New York City, of counsel.

Dorsey & Burke, New York City, for defendant; James F. Hart, New York City, of counsel.

FEINBERG, District Judge.

This is a suit by plaintiff Saturnino Lima Diaz against defendant Gulf Oil Corporation for maintenance and cure. Plaintiff originally brought a cause of action under the Jones Act and for unseaworthiness, but these claims were withdrawn at trial. By stipulation of the parties jury trail was waived. The essential facts are found as set forth below.

Diaz is a Spanish-speaking seaman who has been steadily employed in the maritime service on numerous ships since 1945. He is now forty-nine years old. Diaz has great difficulty with the English language, and the services of an interpreter were required at trial. His last employment was as a galleyman aboard defendant's vessel, the S.S. Gulf Queen, from December 16, 1960 to January 13, 1961. Plaintiff has been bothered with asthma since childhood [1] but has worked steadily. However, at times prior to the crucial dates involved here, plaintiff was rejected by various shipping companies because of asthma.[2] After these occasions, however, plaintiff's condition apparently improved, he was marked fit for duty by the United States Public Health Service ("U.S.P.H.S.") and subsequently shipped out to work as a seaman.

In the fall of 1960, Diaz had an asthmatic attack requiring outpatient care. He was marked fit for duty on November 22, 1960, when his physical condition had improved considerably. On December 14, 1960, plaintiff was rejected by a shipping company for chronic bronchial asthma.[3] He was examined that same day at a U.S.P.H.S. clinic and was again marked fit for duty, but was advised to limit his tours of duty to coastwise or local trips.[4] Two days later, defendant's doctor gave plaintiff a "pre-sign-on" physical and found nothing physically wrong with

---

1. Transcript [hereinafter referred to as "Tr."], p. 30; Plaintiff's exhibit [hereinafter referred to as "Pl. Exh."] 6, p. 18.

2. Tr. pp. 78–80; Pl. Exh. 6, pp. 9, 26–27.

3. Pl. Exh. 6, p. 34.

4. Ibid.

him.[5] On the same day, Diaz commenced his employment on the Gulf Queen.

About January 9, 1961, plaintiff began to feel ill, experiencing severe pains in the chest and elsewhere, coughing and eventually a nose bleed.[6] On January 13, he was paid off the ship at New Haven, Connecticut, only five days prior to the scheduled termination of the voyage, and given a Master's Certificate permitting him to use U.S.P.H.S. facilities. On January 17, he reported to the U.S.P.H.S. clinic at Hudson and Jay Streets in New York City, where his condition was diagnosed as torticollis due to a cold and chronic asthma.[7] Thereafter, he received regular outpatient treatment until February 21, 1961. At that time, although he was still diagnosed as having an upper respiratory infection, the prediction was made that he would be fit for duty on February 28.[8] Plaintiff was not examined again until April 17, and in the intervening period had at least two further attacks of asthma.[9] On that date, plaintiff was rejected by a doctor from Moore-McCormack Lines because of his asthmatic condition and immediately thereafter went to the U.S.P.H.S. clinic for treatment.[10]

Plaintiff continued to receive active outpatient treatment at the U.S.P.H.S. clinic until October 11, 1962. During the course of his treatment, on May 4, 1961, he was marked not fit for duty permanently.[11] After October 11, 1962, plaintiff stopped going to the U.S.P.H.S., but did receive periodic care and treatment at Lincoln and St. Francis Hospitals in the Bronx, including several hospitalizations for severe and sudden asthmatic attacks.[12] Plaintiff has not worked as a seaman since leaving the Gulf Queen and is not physically able to do so now.

The contentions of the parties raise a number of key issues: (1) whether plaintiff actually suffered an asthmatic attack while in the service of the Gulf Queen; (2) whether plaintiff knowingly concealed his asthmatic condition when he was examined by defendant's doctor prior to employment on the Gulf Queen; (3) whether plaintiff has reached a point of maximum cure for his condition and, if so, when; (4) whether he is entitled to recover his expenses for medical treatment and hospital care at non-U.S.P.H.S. facilities; and (5) assuming defendant breached its duty to furnish him maintenance and cure, whether plaintiff is entitled to counsel fees or other damages.

The first issue is whether plaintiff actually became ill aboard the Gulf Queen of the condition from which he claims he has continued to suffer. Although the evidence is conflicting on the point, I find, as a fact, that plaintiff became ill while on, and in the service of, the ship [13] which illness caused a recurrence of his asthma. Since then, plaintiff has continued to suffer from this asthmatic condition, which has since worsened.[14] Although defendant appeared to contend at one point of the trial that there had to be a causal connection between conditions on the ship and plaintiff's asthmatic attack in order to subject defendant to liability for maintenance and cure, this position is clearly erroneous. Calmar S.S. Corp. v. Taylor, 303 U.S. 525, 58 S.Ct. 651, 82 L. Ed. 993 (1938).

On the second issue, the law is that non-disclosure of a physical condition by a seaman must be akin to culpable misconduct in order to bar his action for maintenance and cure, and honest, though negligent, failure to disclose will not defeat his claim. Couts v.

5. Pl. Exh. 5.

6. Tr. p. 103; Defendant's Exhibit [hereinafter referred to as "Def. Exh."] A.

7. Pl. Exh. 2, p. 3.

8. Tr. pp. 47-48; Pl. Exh. 2, p. 7.

9. Pl. Exh. 2, p. 7.

10. Tr. p. 90; Pl. Exh. 2, p. .7.

11. Pl. Exh. 2, p. 9.

12. Tr. pp. 17-20; Pl. Exh. 4.

13. Tr. pp. 38-39, 103-04; Pl. Exh. 2, p. 3.

14. Tr. pp. 27, 31, 38.

Erickson, 241 F.2d 499, 502–503 (5th Cir. 1957); Lipscomb v. Groves, 187 F.2d 40, 45 (3d Cir. 1951); Ahmed v. United States, 177 F.2d 898, 899–900 (2d Cir. 1949). There is no doubt that plaintiff knew he had bouts of asthma prior to his employment application to defendant on December 16, 1960. However, he had just been advised by the U.S.P.H.S. clinic that he was fit for duty so long as he confined himself to coastwise or local trips [15] and was apparently following this advice.[16] Moreover, defendant's doctor examined him and did not find the wheezing or other evidence of asthma which manifested themselves when plaintiff was not feeling well. Cf. Rosenquist v. Isthmian S.S. Co., 205 F.2d 486, 489 (2d Cir. 1953). Plaintiff testified that he was asked by defendant's doctor if he had any diseases and he answered this in the negative.[17] Had plaintiff understood his prior difficulty with asthma as being a disease and the doctor's inquiry to cover past diseases as well as present, plaintiff's conduct might well have barred a maintenance and cure action. However, in view of plaintiff's language difficulties, cf. Ahmed v. United States, supra; Fuentes v. Panama Canal Co., 146 F.Supp. 303, 306 (S.D.N.Y.1956), and the fact that he had just been advised by the U.S.P.H.S. that he was fit for duty, I cannot, in good conscience, find that plaintiff understood the question in the way defendant now urges or engaged in culpable concealment.

■ The next issue is whether plaintiff has reached a point of maximum medical cure. This might, under other circumstances, be a somewhat more complex issue than it is here. However, defendant saw fit to put in no medical testimony. The only evidence in the record on this issue, with one exception to be discussed below, is the testimony of Dr. William Weingarten, an obviously qualified expert in the diagnosis and treatment of asthma and a consultant in internal medicine to the U.S.P.H.S. Hospital on Staten Island.[18] Dr. Weingarten testified that plaintiff has by no means reached the point of maximum medical cure and that the treatment he recommends would have "a good chance"[19] of curing plaintiff's basic condition and would at least improve his condition.[20] The treatment would involve a diagnostic work-up to see if plaintiff's asthma had an allergic basis (which the doctor indicated was quite likely),[21] desensitization if this diagnosis proved to be correct, and use of gamma globulin, antibiotics and drugs such as cortisone. The doctor estimated that treatment might take two to three years and that plaintiff would be benefited by such treatment if it were commenced now,[22] and would have been benefited had it been commenced soon after plaintiff left the Gulf Queen.[23]

■ The only conflicting medical testimony is the notation in the U.S.P.H.S. clinical records that plaintiff, while not fit for duty on February 21, would be fit for duty on February 28.[24] Defendant apparently argues from this that plaintiff reached a point of maximum medical cure at that time.[25] However, Dr. Weingarten stated flatly that the diagnosis that plaintiff was fit for duty on February 28, 1961 "was an incorrect diagno-

---

15. See note 4 supra.

16. The trip was to begin December 16, 1960 and end January 18, 1961, and was limited to the United States coast from Philadelphia, Pennsylvania to Port Arthur, Texas. Def. Exh. A.

17. Tr. p. 82. The report of defendant's doctor (Pl. Exh. 5) merely states "Diseases-neg." Cf. other portions of the report which state "Operations-Denies," "Accidents-Denies."

18. For Dr. Weingarten's qualifications, see Tr. pp. 4–7.

19. Tr. p. 22.

20. Tr. pp. 23–24, 26–27.

21. Tr. p. 30.

22. Tr. p. 25.

23. Tr. pp. 26–27.

24. Pl. Exh. 2, p. 7.

25. Tr. pp. 130–34.

sis." [26]   He further pointed out that the notation in the hospital record made clear that on February 21, plaintiff still had an upper respiratory infection and that no one from the U.S.P.H.S. examined plaintiff after that date, before or on February 28, to see if he actually was fit for duty on February 28.[27]   Even if there had been a flat finding by the U.S.P.H.S. that plaintiff was fit for duty on February 28, on the basis of an examination on that day, this would not be conclusive.   Koslusky v. United States, 208 F.2d 957, 959 (2d Cir. 1953); Diniero v. United States Lines Co., 185 F.Supp. 818, 820 (S.D.N.Y.1960), aff'd, 288 F.2d 595, 91 A.L.R.2d 770 (2d Cir. 1961). Plaintiff had been under treatment at U.S.P.H.S. facilities since January 17, 1961, after he left the Gulf Queen.   Dr. Weingarten's testimony was that the treatment given both at U.S.P.H.S. facilities and Lincoln and St. Francis Hospitals was insufficient to furnish plaintiff the maximum medical cure since nobody suggested the treatment that Dr. Weingarten recommends.   Accordingly, in the absence of medical testimony or other evidence to the contrary, I accept the conclusion of the doctor and find that plaintiff, since January 17, 1961, has never attained the point of maximum medical cure and is, therefore, entitled to unpaid maintenance from that date to the date of trial.   Defendant paid maintenance up to February 28, 1961.[28] Therefore, it is liable for 1345 days at $8 a day [29] or a total of $10,760, with appropriate interest.[30]

■■   Plaintiff urges that he should be reimbursed for his non-U.S.P.H.S. medical bills and for expenses of treatment at Lincoln and St. Francis Hospitals in the Bronx.   However, the record reflects no good reason why plaintiff did not continue his outpatient care at the U.S.P.H.S. clinic.   While this does not affect the right to maintenance, it does lead me to conclude that, except for expenses incurred as a result of medical emergency,[31] plaintiff should not be reimbursed.   Plaintiff was hospitalized several times because of such emergencies and will be allowed the reasonable cost of this hospital care associated with such attacks.   The total for this item, according to the hospital bill in evidence, is $778.   All other non-U.S.P.H.S. expenses for hospital or medical care will be denied.

The foregoing discussion does not deal with the question of allowance for whatever future maintenance and cure might be needed.   Although it would be possible to deal with the issue now and make an award based upon reasonable predictions, Salem v. United States Lines Co., 370 U.S. 31, 38, 82 S.Ct. 1119, 8 L.Ed.2d 313 (1962); Calmar S.S. Corp. v. Taylor, supra, it is more advisable in this case to leave any claim for future maintenance and cure for such future actions as plaintiff may bring.[32]   Plaintiff may be able to obtain the course of treatment recommended by Dr. Weingarten at a U.S.P.H.S. clinic or hospital, particularly since Dr. Weingarten is a consultant to this Service.   Defendant, of course, may wish to protect itself by alternatively offering plaintiff treatment of the sort recommended by Dr. Weingarten, since one of the issues which is at least open to question is how long a period of time such treatment will be necessary.   In any event, the parties should explore this matter further between themselves in an effort to deal with the problem intelligently, reserving to each its legal rights if such efforts break down.

26.  Tr. p. 47.

27.  See note 8 supra.

28.  Pre-trial order, para. 3(b).

29.  The parties have stipulated that the rate of maintenance is $8 a day.

30.  Perez v. Suwanee S.S. Co., 239 F.2d 180 (2d Cir. 1956) (per curiam).

31.  Dr. Weingarten testified that with a sudden attack of asthma requiring hospitalization, it would not be safe for plaintiff to travel to the U.S.P.H.S. Hospital at Staten Island.   Tr. p. 20.

32.  This is a suggestion made in plaintiff's trial memorandum, p. 17.

Plaintiff's claim for counsel fees and other damages will be denied. Although counsel fees may be awarded in an appropriate case, I do not read Vaughan v. Atkinson, 369 U.S. 527, 82 S.Ct. 997, 8 L.Ed.2d 88 (1962), to require them in every case where maintenance and cure has been erroneously withheld. See Stewart v. S.S. Richmond, 214 F. Supp. 135, 137 (E.D.La.1963); Vaughan v. Atkinson, 206 F.Supp. 575, 577 (E.D. Va.1962); The Supreme Court, 1961 Term, 76 Harv.L.Rev. 54, 90–93 (1962). Contra, Jordan v. Norfolk Dredging Co., 223 F.Supp. 79 (E.D.Va.1963); Hurte v. Socony-Mobil Oil Co., 221 F.Supp. 885 (E.D.Md.1963). I cannot say that defendant acted in bad faith, callously or unreasonably here. It did pay maintenance to plaintiff until February 28, at which time it relied on the U.S.P.H.S. prediction in suspending payment. As to other damages, there is not sufficient evidence to warrant any finding for plaintiff.

There is one further point that merits discussion. Since 1945, plaintiff has been employed as a seaman and has suffered asthmatic attacks on ships of other companies.[33] It may be urged that it is inequitable to saddle defendant with years of maintenance and cure payments because plaintiff happened to suffer his last asthmatic attack as a seaman on defendant's vessel twenty-eight days after defendant first employed him. A sufficient answer is that the facts and the present state of the law subject defendant to this liability regardless of the coincidence that plaintiff had never worked for it before. Moreover, the result is not as inequitable as it might seem at first blush. It is true that a change in the rules of law or a workmen's compensation scheme could achieve a more exact and more equitable parceling out of responsibility over all the companies for whom plaintiff has worked. However, the remedy of maintenance and cure is designed to protect seamen generally in an industry encompassing many companies and many ships. In the long run, attaching liability for maintenance and cure to a ship where a recurring condition last manifests itself will probably work out fairly evenly for all the companies involved.

The above incorporates findings of fact and conclusions of law in accordance with Fed.R.Civ.P. 52. Submit an appropriate order on five days notice.