Lloyd **ROBERSON**, Libelant,

v.

**S/S AMERICAN BUILDER**, etc., in rem, and **United States Lines Company**, in personam, **Respondent**.

No. 8588.

United States District Court
E. D. Virginia,
Norfolk Division.

March 29, 1967.

As Amended April 3, 1967.

ditional evidence, involves claims for maintenance, cure, and damages occasioned by way of attorney's fees in allegedly failing to pay maintenance and provide cure.

The libelant, Lloyd Roberson, was injured on November 16, 1964, while employed as a seaman on board the SS AMERICAN BUILDER which was owned and operated by United States Lines Company. When the ship arrived in Norfolk on December 11, 1964, Roberson reported to the United States Public Health Service Hospital, but did not check in on that day. The hospital records indicate that he was told to check in on that day or the hospital would not be responsible. Roberson, however, claims that it was late when he arrived at the hospital and he was told to come back in the morning. In any event, the hospital records indicate that Roberson did not actually check in until December 15, 1964.

Roberson was treated as an inpatient at the hospital for a thrombophlebitic leg condition resulting from his injury until January 30, 1965. Following his discharge on that date, he continued to receive outpatient treatment at the Public Health Service Hospital until June 15, 1965, according to the hospital records. His treatment, both as an inpatient and outpatient, was described as "conservative" in nature, consisting of bed rest, heat treatments, whirlpool therapy and the like.

Amato, Balbalas, Breit, Cohen, Rutter & Friedman, C. Arthur Rutter, Jr., Norfolk, Va., for libelant.

Vandeventer, Black, Meredith & Martin, Walter B. Martin, Jr., Norfolk, Va., for respondent.

## MEMORANDUM

WALTER E. HOFFMAN, Chief Judge.

This action, heard in conjunction with a civil jury case [1] as supplemented by ad-

On February 9, 1965, admittedly on the advice of his attorney, libelant went to see a private physician, Dr. Berger. He made a number of subsequent visits to Dr. Berger's office and, on May 18, 1965, Dr. Berger recommended that Roberson undergo two operations for relief of his thrombophlebitic condition. Roberson apparently told the examining physician at the Public Health Service Hospital about this recommendation on his next visit, for the Clinical Record for May 25 states: "Has been seeing Dr. Berger, private surgeon, who recom-

---

1. Judgment was entered upon a jury verdict in the sum of $10,000.00 in the claim for damages under the Jones Act.

mends surgery in next 2 wk." On that particular visit to the Public Health Service Hospital, libelant was examined by the Surgery Clinic and the need for surgery evaluated. Apparently it was decided to continue the same conservative treatment for the time being.

On June 8, 1965, Roberson was again examined at the Surgery Clinic. The Clinical Record for this visit states: "Patient appears distraught because we have not made plans to operate, since Dr. Berger, to whom his lawyer sent him, suggested surgery to have been done by now."

On Roberson's last visit to the Public Health Service Hospital on June 15, 1965, the examining physician, Dr. Flynn, recommended admission to the hospital and a phlebogram and possible surgery to correct Roberson's deep-vein condition. However, Roberson informed Dr. Flynn that he was already scheduled to be operated upon by Dr. Berger three days later at Leigh Memorial Hospital. This operation was in fact conducted, followed by a second operation on July 13, 1965. Dr. Berger's bill for medical services (excluding charges for attorney's conferences and testifying in court) was $550.00, and Leigh Memorial Hospital's bill was $1074.50.

The evidence indicates that there was a conflict of medical opinion as to whether Roberson should be operated on at once, or whether "conservative treatment" should be continued with a possible operation at a later time. Dr. Berger favored the former, whereas Dr. Flynn, the Public Health Service physician, preferred the latter approach.[2] There is also evidence in the record that the Public Health Service Hospital could have performed the type of surgery which Dr. Berger recommended for Roberson and thereafter performed same.

Respondent paid maintenance to libelant at the contract rate of $8.00 per day until June 18, 1965, the date that Dr. Berger performed his first operation on Roberson. Neither maintenance nor cure has been paid since that date. Dr. Berger testified that, in his opinion, Roberson reached maximum cure around March 1, 1966. Libelant in the present suit is seeking (1) maintenance from July 23, 1965 (the date he left Leigh Memorial Hospital) to March 1, 1966, at the rate of $8.00 per day, with interest; (2) cure in the amount of the private hospital bill and Dr. Berger's fee; (3) attorney's fees and costs (but no other damages) for respondent's refusal to pay maintenance and cure.

The legal issues may be stated as:

(1) Is libelant entitled to maintenance and cure after he apparently became dissatisfied with the Public Health Service Hospital's treatment and sought the services of a private physician?

(2) Is respondent liable for libelant's attorney fees and costs for refusing to pay maintenance and cure under the circumstances here presented?

The general rule of law relating to cure, as applied to the present situation, is stated in Gilmore and Black, Law of Admiralty, pp. 266, 267, as follows:

"The seaman does not have a free hand in choosing his own physician and deciding on his own treatment. The United States Public Health Service maintains Marine Hospitals at which seamen may receive low cost or free care and treatment. An ill or injured seaman who has been given a 'hospital ticket' by the master and provided with transportation to the nearest Marine Hospital will usually be held to have acted at his own risk and expense if he either refuses to enter the Marine Hospital and to follow the advice of the Public Health Service physicians or if he consults private physicians or enters another hospital.

2. Support is given to the more "conservative" approach from the reports of Dr. Eugene L. Lowenberg, an outstanding expert in the field of vascular surgery, who was selected by the Court to conduct an independent examination prior to trial, but some months after the operations.

"Nevertheless, if the judge concludes that the facilities or treatment afforded the seaman are inadequate, he may allow recovery for expenses incurred outside the Public Health Service system or even order the seaman removed at the shipowner's expense to a place where adequate treatment is available."

■ There is nothing in this record to indicate that the facilities or treatment afforded Roberson were inadequate. There was merely an honest difference of opinion on a difficult medical decision. Accordingly, if Roberson wanted to hold the shipowner liable for cure, he was obliged to follow the advice of the Public Health Service physicians.

The same general rule with respect to the seaman's right to select his own physician and hospital is contained in Norris, The Law of Seamen, 2 Ed. § 594, p. 685, as follows:

"Unless there are exceptional circumstances (such as mental incapacity), the better rule would appear to be against an election of medical treatment by the seaman in the absence of a definite offer by his employer. The fact that United States Public Health Service Hospitals throughout the country are open to seamen for medical treatment is so well known among them that it should preclude the argument that seafarers may be ignorant of their right to free hospitalization and medical care.

"Refusal by a seaman to avail himself of Public Health Service hospital facilities includes not only outright rejection of proffered aid, but also undue neglect to seek medical treatment and resort to the services of private physicians and private hospital care when Public Health Service hospitalization is obtainable."

It is sufficient to state that there were no "exceptional circumstances" here presented. Once again, it was merely a difference of opinion between reputable physicians.

In Kossick v. United Fruit Co., (1961) 365 U.S. 731, 737, 81 S.Ct. 886, 891, 6 L.Ed.2d 56, an "exceptional circumstance" was noted as follows:

"Presumably if a seaman refuses to enter a public hospital or, having entered, if he leaves to undergo treatment elsewhere, he may recover the cost of such other treatment upon proof that 'proper and adequate' cure was not available at such hospital."

Roberson's reliance upon Nunes v. Farrell Lines, Inc., (D.C.Mass., 1955) 129 F.Supp. 147, is misplaced. In that case the Marine Hospital neither offered nor recommended the necessary treatment. In the case at bar, the Marine Hospital stood ready, able and willing to perform the operation, but insisted upon a more adequate evaluation before operating. Likewise, in Scott v. Lykes Bros. Steamship Co., (E.D.La., 1957) 152 F.Supp. 104, the seaman was declared by the Marine Hospital as having reached a "static condition", but thereafter improved his condition by reason of private treatment. Apparently the theory in *Scott* was that "adequate treatment" was not available in the public facility.

"Exceptional circumstances" confronted the Court in Boulieris v. The S.S. Matrozos, (E.D.Va., 1959) 169 F.Supp. 824, where it appeared that an operation was needed and the seaman was in Greece. The custom in Greece was to perform only emergency operations during the heat of the summer months. The court merely held that a deferment of the operation under all the circumstances of the case was not the equivalent of an outright declination which would relieve the shipowner of any further obligation of cure.

In Pitsillos v. The S.S. George, (E.D. Va., 1959) 176 F.Supp. 351, aff'd sub nom. Puerto Seguro Cia. Naviera, S.A. v. Pitsillos, 4 Cir., 279 F.2d 599, this Court referred to Norris, The Law of Seamen, Vol. 2, § 592, p. 224, and pointed out that, where the shipowner provides reasonably competent medical attention, the seaman is not at liberty to increase the lia-

bility of the shipowner by seeking additional medical treatment without cause.[3]

Spanos v. The Lily, (E.D.Va., 1958) 163 F.Supp. 335, aff'd 4 Cir., 261 F.2d 214, is not to the contrary. True, small bills were directed to be paid to a private hospital and two physicians. However, it clearly appears that his injury was not initially deemed serious and he was first seen at a private hospital by a private physician on or about January 8, 1957, and was thereafter sent to the Marine Hospital where he remained until February 1, 1957. These expenses were all preliminary to the seaman's admission to the Marine Hospital and were allowed under the theory that the seaman had a right to know whether his condition was such that he should be hospitalized.

Along like lines are Diaz v. Gulf Oil Corp., (S.D.N.Y., 1965) 237 F.Supp. 261 (the only allowable private medical bills being an emergency); Sobosle v. United States Steel Corp., (3 Cir., 1966) 359 F.2d 7 (involving a mental condition which affected the ability of the seaman to comply with order of physicians and the court).

■■ We conclude from the foregoing that it is not within the purview of the seaman to elect to receive medical treatment at the expense of the shipowner merely because a private physician advises him that an operation should be performed, whereas the Marine Hospital physician prefers a more conservative approach and suggests further evaluation before performing such an operation. The items of expense involving bills of Dr. Berger and Leigh Memorial Hospital are disallowed.[4]

■■ As heretofore noted, the shipowner stopped maintenance payments as of June 18, 1965, which was the date of the operation by the private physician. This was clearly unjustified under decisions from the Fourth Circuit. While there is textbook authority to the effect that maintenance and cure run hand in hand, Norris, The Law of Seamen, 2 Ed., Vol. 1, § 594, p. 683, and that the refusal of medical care in a Marine Hospital is a bar to maintenance and cure, we think that the decided weight of authority is as stated in Rodgers v. United States Lines Co.,[5] (4 Cir., 1951) 189 F. 2d 226, 229, where Judge Dobie said:

"The final question is whether this is a proper case for maintenance. United contends maintenance was improper because Rodgers refused to accept medical care offered at the Marine Hospital in Norfolk. In our opinion, Rodgers' election to receive private medical treatment is not a bar to maintenance."

Nor do we think that the days spent in Leigh Memorial Hospital should be deducted from the claim for maintenance under this ruling where the bill of the private hospital is disallowed. Of course, if the shipowner had been required to provide for such cure, during which time the seaman would receive room and board at the hospital in lieu of maintenance, or if cure had been provided at a charitable institution [6] without charge to him,[7] it is fundamental that maintenance would cease during the period of hospitalization. And where the seaman lives at home with his parents, thereby incurring no actual expense or liability

---

3. While it is of no significance, the private physician selected in *Pitsillos* is the same private physician involved in the present case.

4. An additional recourse available to Roberson would have been to seek an interlocutory decree as was done in Boulieris v. The S. S. Matrozos, 169 F.Supp. 824. The matter had been referred to counsel as early as February, 1965, at least 4 months prior to the operation.

5. The shipowner in that case is the same shipowner as in the present case. Apparently one adverse decision is not enough.

6. Williams v. United States, 4 Cir. (1955) 228 F.2d 129 (where seaman was confined to a state mental institution without charge to him).

7. Ballard v. Alcoa S.S. Co., Inc., (D.C.Ala., 1954) 122 F.Supp. 10 (where seaman was confined in jail).

for his care and support, he is not entitled to maintenance. Johnson v. United States, 333 U.S. 46, 68 S.Ct. 391, 92 L. Ed. 468. However, in the present case, Roberson is entitled to maintenance at the rate of $8.00 per day from June 18, 1965 until March 1, 1966, at which time he reached maximum cure, together with interest at the rate of 6% per annum computed weekly, but not compounded. Perez v. Suwanee Steamship Co., (2 Cir., 1957) 239 F.2d 180; Vaughan v. Atkinson (E.D.Va., 1959) 200 F.Supp. 802, aff'd., 4 Cir., 291 F.2d 813, reversed, 369 U.S. 527, 82 S.Ct. 997, 8 L.Ed.2d 88.

This brings us to the final point. Has the shipowner been "callous" in its attitude in stopping maintenance payments as of June 18, 1965, when Roberson entered a private hospital to undergo an operation and, if so, to what extent should the shipowner respond in damages incurred by reason of attorney's fees in his efforts to collect the maintenance legally due to him under the doctrine enunciated in Vaughan v. Atkinson, 369 U.S. 527, 82 S.Ct. 997, 8 L.Ed.2d 88.

At the outset it should be noted that there is a conflict among decisions emanating from this court. Following the reversal and remand in *Vaughan*, the case again came before the court. Vaughan v. Atkinson, (E.D.Va., 1962) 206 F.Supp. 575. This court there stated that the payment of damages by way of attorney's fees was not commanded *in all cases* where maintenance claims are in litigation. One year later a visiting judge held to the contrary without reference to the prior opinion. Jordan v. Norfolk Dredging Company (E.D.Va., 1963) 223 F.Supp. 79. With deference to a distinguished colleague, this court reasserts its prior position which is now supported by a long line of authorities, including Diaz v. Gulf Oil Corporation, (S.D.N.Y., 1965) 237 F.Supp. 261, 266; Stewart v. S.S. Richmond, (E.D.La., 1963) 214 F.Supp. 135; Pyles v. American Trading & Production Corporation, (S.D.Tex., 1965) 244 F.Supp. 685; Con-

norton v. Harbor Towing Corp., (D.Md., 1964) 237 F.Supp. 63; Diddlebock v. Alcoa Steamship Company, (E.D.Pa., 1946) 234 F.Supp. 811; and Johnson v. Mississippi Valley Barge Line Company, (3 Cir., 1964) 335 F.2d 904 (footnote 2).

At least one appellate court has held in accord with the majority and has expressly disagreed with Jordan v. Norfolk Dredging Co., supra. See Roberts v. S.S. Argentina (2 Cir., 1966) 359 F.2d 430.

■ The ultimate test is, therefore, whether the shipowner was acting in good faith or, stated otherwise, whether the shipowner was "callous", "recalcitrant" or clearly unjustified in failing to pay maintenance or in not resuming maintenance payments as in this case.

From the evidence presented we think that the shipowner was probably justified in stopping maintenance payments when Roberson underwent an operation in a private hospital under the hands of a private physician. This, however, did not bar all future maintenance payments as indicated above. It was reasonable for the shipowner to await the initial results of the operation before continuing payments. Moreover, until the shipowner's responsibility for the private hospital and medical care could be ascertained, it was impossible to determine whether maintenance was due for the time spent in the private hospital.

Under date of August 25, 1965, counsel for Roberson requested counsel for the shipowner to resume payments of maintenance.[8] Roberson's attorney forwarded to shipowner's counsel a letter from Dr. Berger, the private physician, to the effect that Roberson was still disabled and would remain in that category for approximately 30 more days. By letter dated September 13, 1965, counsel for the shipowner advised that Roberson's right to maintenance ceased when he entered the private hospital. Roberson's attorney replied by letter dated September 14, 1965, and correctly stated the law with

8. Roberson's counsel had been instructed to forward all claims for maintenance to counsel for the shipowner by letter dated May 21, 1965.

regard to the duty to pay maintenance. The shipowner's attorney replied by letter dated September 17, 1965, reiterating his former position and stating that, if Roberson was in need of further treatment, he should submit to the facilities of the United States Public Health Hospital. This action was filed on September 23, 1965.[9] Later, on December 7, 1965, Roberson's attorney again demanded the resumption of maintenance payments and forwarded a duty status slip as the seaman was still disabled and had not reached maximum cure. By letter dated December 9, 1965, shipowner's counsel again stated that, when Roberson refused the services of the Public Health Service Hospital, he forfeited his right to both maintenance and cure.

A hearing on the claim for maintenance and cure was conducted on January 20, 1966, but was never decided because of settlement negotiations which did not materialize. In the interim, Roberson was directed to submit to an examination by Dr. Lowenberg.

■ We think that, in part, the shipowner was unjustified and, therefore, "recalcitrant" in refusing to resume maintenance payments around the middle of September, 1965, until the time of the hearing on January 20, 1966. Just as the seaman's attorney erroneously interpreted the law with respect to the obligation of the shipowner to provide cure under the circumstances here related, so also the shipowner's attorney misinterpreted the law of the Fourth Circuit as to the obligation to pay maintenance where the seaman seeks private hospital and medical treatment. See Rodgers v. United States Lines Co., supra. There is a duty upon both the seaman and shipowner to adhere to the law. To permit the shipowner to avoid the consequences of Vaughan v. Atkinson, supra, under the guise of taking the advice of counsel, without any apparent effort to examine the authorities, would effectively emasculate the decision of the United States Supreme Court. Moreover, the case was pending in this court at all times after September 23, 1965, and it would have been a relatively simple procedure for the shipowner to have procured an order directing Roberson to submit to an examination at the Public Health Service Hospital or elsewhere, if there had been any question as to whether Roberson was fit for duty or had otherwise reached maximum cure.

Computing the period of wrongful withholding of maintenance payments at 18 weeks, or 126 days, the plaintiff is allowed one-third of the maintenance due for this time by way of damages resulting from the unjustified and "recalcitrant" action of the shipowner in not resuming these payments. The amount allowed by way of such damages is $336.00, without interest on said sum, but with interest on the delinquent payments.

No damages are allowed on payments falling due on and after January 20, 1966, as the further delay was occasioned by Roberson's own actions in rejecting a settlement recommended by his counsel.

A decree may be presented in accordance with the rulings herein made.

---

9. The civil action was instituted on June 4, 1965.