# GENE SPRINGLE *v.* COTTRELL ENGINEERING CORPORATION

[No. 1270, September Term, 1977.]

*Decided September 6, 1978.*

The cause was argued before MORTON, THOMPSON and WILNER, JJ.

*Philip Abraham,* with whom was *Murray I. Resnick* on the brief, for appellant.

*Theodore B. Oshrine,* with whom were *Donald C. Allen* and *Allen, Thieblot & Alexander* on the brief, for appellee.

WILNER, J., delivered the opinion of the Court.

We have before us cross-appeals from a judgment entered by the Circuit Court for Anne Arundel County on an action by Gene Springle. Mr. Springle was a seaman who claims to have been injured while serving aboard the dredge "Richmond", and he sued the owner of the dredge (Cottrell Engineering Corporation) because of its failure to provide him with maintenance and cure.[1] The threshold question arises from appellee's cross-appeal; that is, whether the court had jurisdiction to entertain this action in the first place (or, more precisely, whether the court erred in denying its motion raising preliminary objection filed under Maryland Rule 323, alleging a want of jurisdiction over appellee).

After pointing out that appellant is a resident of North Carolina, that appellee is incorporated in Delaware and has its principal office in Virginia, and that the incident giving rise to the claim for maintenance and cure occurred in North Carolina, appellee asserts that "[i]n order for a Maryland Court to have jurisdiction over a foreign corporation, one of the requirements set forth in § 6-103 of the Courts and Judicial Proceedings Article (the Long Arm Statute) must be complied with." Building upon that foundation, appellee attempts to show how it does not meet any of the six requirements for *in personam* jurisdiction under that statute. More precisely, appellee's claim appears to be that *this cause of action* did not arise from any of the types of contacts with Maryland enumerated in § 6-103, and for *that* reason, jurisdiction does not exist in this case.

The question of jurisdiction may not be decided *solely* on the basis of § 6-103, however. Drawn into play as well are

---

1. For convenience, we shall refer to plaintiff Springle as appellant (though he is also a cross-appellee) and to defendant Cottrell as appellee (though it is also a cross-appellant).

Courts article § 6-102 (a), Corporations and Associations article § 7-210, and the overlay of due process which, ultimately, circumscribes the reach of the *in personam* jurisdiction of a Maryland court over a foreign corporation.

To trace through the interplay of these statutes and concepts, we first must identify what they are.

The "bases of personal jurisdiction" of Maryland courts are set forth in Courts article, §§ 6-101 through 6-104. Section 6-101 consists of definitions. Section 6-102 provides:

"(a) A court may exercise personal jurisdiction *as to any cause of action* over a person domiciled in, *served with process in,* organized under the laws of, or who maintains his place of business in the state.

(b) This section does not limit any other basis of personal jurisdiction of a court of the state." (Emphasis supplied.)

Section 6-103, which is generally referred to as "long-arm" statute, provides:

"(a) If jurisdiction over a person is based solely upon this section, he may be sued only on a cause of action arising from any act enumerated in this section.

(b) A court may exercise personal jurisdiction over a person, who directly or by an agent:

(1) Transacts any business or performs any character of work or service in the state;

(2) Contracts to supply goods, food, services, or manufactured products in the state;

(3) Causes tortious injury in the state by an act or omission in the state;

(4) Causes tortious injury in the state or outside of the state by an act or omission outside the state if he regularly does or solicits business, engages in any other persistent course of conduct in the state or derives substantial revenue from goods, food,

services, or manufactured products used or consumed in the state;

(5) Has an interest in, uses, or possesses real property in the state; or

(6) Contracts to insure or act as surety for, or on, any person, property, risk, contract, obligation, or agreement located, executed, or to be performed within the state at the time the contract is made, unless the parties otherwise provide in writing."

Section 6-104 codifies the doctrine of *forum non conveniens.* It provides:

"If a court finds that in the interest of substantial justice an action should be heard in another forum, the court may stay or dismiss the action in whole or in part on any conditions it considers just."

The record here shows that appellee qualified to do business in Maryland in 1964; that, pursuant to State law it appointed and has maintained a resident agent authorized to accept service of process on its behalf; and that service of process in this case was, in fact, duly made in Maryland upon that resident agent so appointed. In that circumstance, § 6-102 (a) would appear to provide an independent basis for jurisdiction over appellee, a basis apart from those set forth in § 6-103 and founded solely upon appellee's being served with process in Maryland. Two questions arise, however, as to whether § 6-102 (a) may be applied in quite so straightforward a manner. The first is whether, and to what extent, Corporations and Associations article, § 7-210, detracts from this basis of jurisdiction, and the second is whether, and to what extent, jurisdiction may constitutionally attach to a foreign corporation simply by virtue of its being served with process in Maryland. These two questions are very much interrelated.

Section 7-210, which is part of the subtitle dealing with the registration and qualification of foreign corporations, provides:

"With respect to any cause of action on which a

foreign corporation would not otherwise be subject
to suit in this State, compliance with this subtitle:

(1) Does not *of itself* render a foreign corporation
subject to suit in this State; and

(2) Is not considered as consent by it to be sued in
this State." (Emphasis supplied.)

There is an historical relationship between these three
statutes (§§ 6-102 and 6-103, Courts article, and § 7-210,
Corporations article) which emanates from the due process
requirements laid down, from time to time, by the Supreme
Court.

In *Pennoyer v. Neff,* 95 U. S. 714 (1878), the Court held, in
effect, that, in order for a State court to determine the
personal liability of a defendant, and to render a valid *in
personam* judgment against him, "he must be brought within
its jurisdiction by service of process within the State, or his
voluntary appearance." 95 U. S. at 733. The Court did permit
somewhat of an end run around this principle when it stated,
at page 735:

"Neither do we mean to assert that a State may not
require a non-resident entering into a partnership or
association within its limits, or making contracts
enforceable there, to appoint an agent or
representative in the State to receive service of
process and notice in legal proceedings instituted
with respect to such partnership, association, or
contracts, or to designate a place where such service
may be made and notice given, and provide, upon
their failure, to make such appointment or to
designate such place that service may be made upon
a public officer designated for that purpose, or in
some other prescribed way, and that judgments
rendered upon such service may not be binding upon
the non-residents both within and without the State."

This "exception" was not very helpful, however, with
respect to foreign corporations, which continued to transact
business of varying types and degrees within the borders of

many States, without appointing "resident" agents to accept service of process.

In order to bring a foreign corporation within the range of personal jurisdiction permitted by *Pennoyer v. Neff,* and its predecessors, a number of theories and fictions were tried by the States. *See* Fletcher Cyclopedia Corporations (1977 Rev.), Vol. 18, § 8640; *Jurisdiction of Maryland Courts over Foreign Corporations Under the Act of 1937,* 3 Md.L.Rev. 35 (1938); *The "Long Arm" Comes to Maryland,* 26 Md.L.Rev. 13 (1966). Maryland's approach to the problem was found in Laws of Md., 1868, ch. 471, codified as Md. Code (1888), art. 23, §§ 288, 290. Section 288 provided that any corporation not chartered by the laws of Maryland "which shall transact business therein, shall be deemed to hold and exercise franchises within this State, and shall be liable to suit in any of the courts of this State, on any dealings or transactions therein." Section 290 provided that suits may be brought in Maryland "against any corporation not incorporated under its law, but deemed to hold and exercise franchises therein . . . by a resident of this State, for any cause of action; and by a plaintiff, not a resident of this State, when the cause of action has arisen, or the subject of the action shall be situated in this State. . . ." Process was permitted to be served upon "any agent of such corporation".

Maryland, in common with many States, thus adopted the premise that if a foreign corporation "transacted business" in the State, it was subject to the jurisdiction of the State's courts, at least to the extent that the statute permitted such jurisdiction to be exercised. If service of process could be obtained in accordance with § 290, the Maryland courts were open to any resident of the State upon any cause of action, and to non-residents if the cause of action arose or the subject matter of the action was situate in the State. Maryland courts had no jurisdiction, however, over a suit against a foreign corporation by a non-resident upon a cause of action arising (or a subject matter situate) elsewhere, unless the defendant corporation appeared voluntarily, in which event jurisdiction could be exercised. *See Fairfax Forrest Co. v. Chambers,* 75 Md. 604 (1892).

The General Assembly rewrote the corporation law in 1908 (Laws of Md., 1908, ch. 240). In new section 67 (of art. 23), it provided that "any person or corporation, whether a resident or a non-resident of this State, may sue any foreign corporation regularly doing business or regularly exercising any of its franchises herein for any cause of action." Facilitating the exercise of this right, section 68 required every foreign corporation (except insurance companies) "which has a usual office or place of business in this State" to file with the Secretary of State (1) a copy of its charter, and (2) an annual certificate stating, among other things, "the name and address of its agent, resident in this State, and authorized to accept service of process upon it" and "its willingness that so long as any liability remains outstanding against it in this State, the authority of such agent shall continue until a substitute is appointed. . . ." This change introduced the concept (and requirement) of a "resident agent" and expanded the right to sue on matters not arising within the State to non-residents. *See Hagerstown Brewing Co. v. Gates,* 117 Md. 348 (1912). On the other hand, it limited jurisdiction to those foreign corporations "regularly" doing business or exercising their franchises in Maryland.

Whereas under the earlier law State jurisdiction rested exclusively upon the "presence" of a foreign corporation presumed by reason of its transacting business in the State, the device of requiring the appointment of a resident agent authorized to accept service of process added another theory, or fiction, upon which such jurisdiction could be based — that of consent. This is a theory that won apparent Supreme Court approval in *Pennsylvania Fire Insurance Co. v. Gold Issue M. & M. Co.,* 243 U. S. 93 (1917).

In 1937, the General Assembly, as part of another major revision in the corporation law, again dealt with the question of jurisdiction over foreign corporations. Laws of Md., 1937, ch. 504. In new § 118 of art. 23, it provided a tri-partite jurisdiction, fairly described by Professor Kenneth Reiblich in 3 Md.L.Rev. at 36, 37 *(supra)* as follows:

"(1)   a general jurisdiction to be asserted over all foreign corporations 'doing business' in

Maryland, regardless of where the cause of action arose, and regardless of where the plaintiff is a resident; (2) a continuance of such jurisdiction after the corporation has ceased to do business in Maryland, as to causes of action arising out of business done in Maryland, or in favor of Maryland residents and others with a usual place of business in Maryland; (3) jurisdiction for any cause of action arising out of any act done in Maryland, whether or not the corporation is regularly doing business, if *plaintiff* is a resident or has a usual place of business in Maryland."

Section 119 required every foreign corporation, with exceptions not relevant here, to have at least one resident agent in the State. It provided also that "service of process upon any such resident agent of a foreign corporation shall bind such foreign corporation *in any action in which it is subject to suit in this State.*" (Emphasis supplied.) Section 105 provided that, if a resident agent could not be found, or served, process could be served upon "any agent or other person expressly or impliedly authorized to accept such service", and further that, if a foreign corporation failed to appoint a resident agent "such corporation shall be conclusively presumed to have designated the State Tax Commission as its true and lawful attorney authorized to accept on its behalf service of process in the action in which such process issued...."

Immediately, considerable apprehension was expressed that the registration requirements and the sanctions for their violation might constitute an undue burden on interstate commerce, at least with respect to corporations doing only interstate business.[2] There was, indeed, a legitimate basis for that concern; in *Sioux Remedy Co. v. Cope,* 235 U. S. 197 (1914), the Supreme Court had stricken down a somewhat

---

2. *See, for example,* Address given by Herbert Myerberg, Esq. to the Bar Association of Baltimore City, reprinted in The Daily Record, October 15, 1937.

analogous scheme enacted by South Dakota.[3] The Attorney General attempted to answer that concern, avoid the objections raised to the South Dakota statute, and thus sustain the facial validity of the new law by construing the registration requirement, and the effect of compliance with it, very narrowly. In response to an inquiry by the State Tax Commission, he opined:[4]

> "It should be noted that the requirement of registration, by designating an agent for the service of process, does not subject foreign corporation *doing an interstate business* to suit in any case where such corporations would not have been subject to suit under the preexisting law. In other words, the requirement of designating an agent does not enlarge the liabilities of such corporations, since Section 118, as amended, appears to be no broader in substance than in its previous form, as enacted by Chapter 240 of the Acts of 1908." (Emphasis supplied.)

Two months later, the Attorney General made clear that this statement applied as well to "corporations doing a foreign business." 22 Op.Atty.Gen. 262 (1973). Here, he concluded:

> "As we construe the amended statute, the State requires every foreign corporation, doing interstate or foreign business in the State in such a manner and to such an extent that it is subject to suit in this State, to disclose how it can be reached by process in actions in which it is subject to suit in this State.

---

3. The South Dakota statute prevented a foreign corporation from suing in the State courts unless it complied with the registration requirements. The requirement that the corporation appoint a resident agent the Court held to be "particularly burdensome, because ... it requires the corporation to subject itself to the jurisdiction of the courts of the state in general as a prerequisite to suing in any of them.... If one state can impose such a condition others can, and in that way corporations engaged in interstate commerce can be subjected to great embarrassment and serious hazards in the enforcement of contractual rights directly arising out of and connected with such commerce." 235 U. S. at 205.

4. 22 Op.Atty.Gen. 256, 259 (1937).

No attempt is made to exact from the corporation a consent to be sued in this State in actions in which it could not otherwise be so sued.

"If compliance with the registration requirement constituted consent to suit in this State, in actions in which the corporation could not constitutionally be made subject to suit, the registration requirement would be unconstitutional." [5]

Professor Reiblich acknowledged these two opinions in his rather comprehensive law review article. As to the "commerce clause" problem, he stated that the current law was unclear as to whether a corporation by qualifying "could consent (and therefore waive any right to object) to unreasonable burdens imposed on its interstate business." Reiblich's principal concern involved due process principles. He considered the opinions of the Attorney General to stand for the proposition that "compliance with section 119 (qualification) would not be deemed a consent to jurisdiction not otherwise present." (p. 38). Citing no authority, however, he noted, "But under the cases to date, compliance with the qualification sections of such a law has been taken to be consent to the jurisdiction provisions." Reiblich saw the problem as involving the distinction between foreign corporations that complied with the requirements of § 119 and qualified and those that ignored the statutory requirement. Relying upon *Pennsylvania Fire Insurance Co. v. Gold Issue M. & M. Co., supra,* he concluded, contrary to the opinion expressed by the Attorney General, that, "as to the qualifying corporation, the prevailing present opinion would be that the provisions of the Maryland law are entirely valid as far as the 'due process' objection is concerned, even though qualification is taken to be consent to jurisdiction. In such case jurisdiction is said to rest upon the express consent of the foreign corporation and may be asserted as broadly as the law allows."

5. The question to which this opinion responded was: "If a foreign corporation which is doing *only interstate or foreign business* in this State registers under Section 119, will it thereby subject itself to suit in this State in actions in which it would not otherwise be subject to suit therein?" *See* 22 OAG 262.

The situation, he concluded, was different with respect to "non-qualifying" corporations. As to them, the "express consent" basis of jurisdiction did not exist; and, absent that, jurisdiction under § 118 (a) could be based *only* upon a showing that the defendant corporation was "doing business" in the State. This created a number of problems for a would-be plaintiff, however. Isolated contacts with the State would not suffice; for jurisdiction to lie under the "doing business" theory, a greater quantum and regularity of contact was necessary — that sufficient to establish the corporation's "presence" in the State. Even where that hurdle was cleared, Reiblich questioned whether jurisdiction based solely upon "doing business" might not constitutionally be limited to causes of action arising in the State. The net effect of this disparity between the practical scope of jurisdiction arising from "consent" and that arising from "doing business" would be to reward the corporation that ignored the requirements of § 119 and failed to qualify in Maryland and, conversely, to penalize those corporations that complied with the law.

Reiblich believed that, from a "due process" point of view, equal jurisdiction could exist under either approach — that "doing business" amounted to an implied consent, and that the same jurisdiction applicable to a qualifying corporation upon an "express consent" theory could also be applied to a non-qualifying corporation doing business in Maryland. He recognized, however, that, for policy reasons, it may be inappropriate for the Maryland courts to *exercise* the jurisdiction that they constitutionally and by statute possessed where the cause of action did not arise in this State. The answer to that, he suggested, was an expanded use of the doctrine of *forum non conveniens* — that the court simply decline to exercise its jurisdiction if another forum existed and was more appropriate.

The opinions of Professor Reiblich and the Attorney General were not shared by Judge Eugene O'Dunne of the Circuit Court for Baltimore City. In *Steinwender, Stoffregen & Co. v. Ritchey, et al.* (Daily Record, Sept. 14, 1940), that court, basing its decision primarily upon *Sioux Remedy Co. v. Cope, supra,* declared the registration requirements of

sections 119 and 120, as enacted by ch. 504, unconstitutional as applied to a foreign corporation doing *any* interstate business in Maryland. The court declared "the registration provision and appointment of resident agent, and deposit of [the $200 penalty exacted for failure to comply] unconstitutional, as attempted to be applied to *interstate* commerce, but as being entirely constitutional when applied exclusively to *intrastate* commerce."

Shortly after this decision by Judge O'Dunne, the General Assembly convened for its 1941 session, in which it enacted Laws of Md., 1941, ch. 687. This was the original enactment of what is now Corporations article, § 7-210. It amended § 120 (a) of article 23 [6] by adding to it the following italicized language.

"Service of process upon any such agent of a foreign corporation shall bind such foreign corporation in any action in which it is subject to suit in this State; *but, notwithstanding any other provisions of this Article to the contrary, compliance with this section shall not of itself render a foreign corporation subject to suit in this State, or be construed as a consent by it to be sued in this State, on any cause of action on which it would not be subject to suit in this State if it had not complied with this section."* (Emphasis supplied, indicating the amendment.)

There is no direct legislative history indicating the purpose of this statute; even the title to the Act is silent except to note the article and section amended. This precise question was addressed, however, in *Gibson v. United States Lines,* 74 F. Supp. 776 (D. Md., 1947) where, after reciting some of the history recounted above, Judge Chesnut concluded, at page 780:

"And I think it clearly inferable that the intention of the Legislature in passing the Act of 1941 was to make it clear that if foreign corporations did qualify or register with the State Tax Commission, they

6. This corresponds to § 119 (a). In 1939, a new Code was adopted, and § 119 of the 1924 Code (as amended in 1937) became § 120 of the 1939 Code.

would not merely thereby subject themselves to suit in Maryland on causes of action as to which they had a constitutional right to exemption *by reason of interstate business.*" (Emphasis supplied.)

Placing the 1941 Act in context, he opined, at page 779:

"In the first place, it is to be noted that so far at least as the liability of foreign corporations to suit in the Maryland State Courts is concerned, the fundamental basis therefor is not the designation of a resident agent, but the 'doing of business' within the State. The requirement of the appointment of a resident agent is procedural in nature, to facilitate the service of process on the corporation, and to make the suit against it effective. The purpose of the Act of 1941 was to make it clear that a foreign corporation, not subject to suit in this State under the provisions of section 119 (as, for instance, where the business is only interstate or foreign as opposed to intrastate), does not subject itself to suit merely by appointing a resident agent."

In this passage, Judge Chesnut construed the 1941 amendment as clearly rejecting the "express consent" basis of jurisdiction — *i.e.,* "express consent" implied or arising from compliance with the qualification requirements. If, as he put it, the "fundamental basis" of State jurisdiction was the "doing of business", then the 1941 Act was intended to do nothing more than to satisfy the objections raised in Judge O'Dunne's opinion, and to express in the Maryland Code what was then perceived to be the constitutional limitation upon State jurisdiction.[7]

_____

7. The "consent" theory of jurisdiction still had vitality, but the "consent" was derived from the doing of business in the State (and thus assenting to all the laws of the State, including those pertaining to qualification by foreign corporations and service of process) rather than from qualification itself. *See* 3 Md.L.Rev. at 50; *also* Brune, Maryland Corporation Law and Practice, Rev. Ed., § 422, p. 493. It may also be noted that, notwithstanding the 1941 Act and the concepts that impelled it, the mere appointment of a resident agent in Maryland (and service of process upon him) sufficed to constitute a waiver of the venue privilege in federal cases. *See, for example,* Carbide & Carbon Chemicals Corp. v. United States Industrial Chemicals, 140 F. 2d 47 (4th Cir., 1944); Gibson v. United States Lines, *supra,* 74 F. Supp. 776.

The constitutional framework within which these various theories operated was changed substantially when the Supreme Court decided *International Shoe Co. v. Washington,* 326 U. S. 310 (1945). Sweeping away some (but not all) of the fictions upon which jurisdiction over foreign corporations had previously been founded, the Court fashioned a new, more flexible, test which, with citations omitted, it stated thusly (326 U. S. at 316):

> "Historically the jurisdiction of courts to render judgment in personam is grounded on their de facto power over the defendant's person. Hence his presence within the territorial jurisdiction of a court was prerequisite to its rendition of a judgment personally binding him. . . . But now that the capias ad respondendum has given way to personal service of summons or other form of notice, *due process requires only that in order to subject a defendant to a judgment in personam, if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'*

> \* \* \*

> "Since the corporate personality is a fiction, although a fiction intended to be acted upon as though it were a fact . . . it is clear that unlike an individual its 'presence' without, as well as within, the state of its origin can be manifested only by activities carried on in its behalf by those who are authorized to act for it. To say that the corporation is so far 'present' there as to satisfy due process requirements, for purposes of taxation or the maintenance of suits against it in the courts of the state, is to beg the question to be decided. For the terms 'present' or 'presence' are used merely to symbolize those activities of the corporation's agent within the state which courts will deem to be

sufficient to satisfy the demands of due process. . . . *Those demands may be met by such contacts of the corporation with the state of the forum as make it reasonable, in the context of our federal system of government, to require the corporation to defend the particular suit which is brought there."*

Fletcher boils all of this down as follows (§ 8640.1):

"In other words, the court replaces the implied consent and presence theories with one of reasonableness: Does the corporation have sufficient minimum contacts with the forum to make it reasonable to subject it to the jurisdiction of the forum in view of the quality and nature of the corporate activity."

*International Shoe Co.* left open the question of whether a foreign corporation possessing the requisite minimum contacts with a State to establish general jurisdiction could yet be sued on a cause of action that was not related to its activities in the State. That question was answered in *Perkins v. Benguet Consolidated Mining Co.,* 342 U. S. 437 (1952), when the Court concluded that due process would not be offended by the exercise of such jurisdiction. Whether jurisdiction should be exercised in such a case was a matter for the State to determine.

Following these decisions and one other — *McGee v. International Life Ins. Co.,* 355 U. S. 220 (1957) — a number of States began to enact what became known as "long-arm" statutes, extending local jurisdiction over foreign corporations based solely upon the most minimal activities within the State. Maryland entered these waters in 1964, but in a somewhat confusing way.

By Laws of Md., 1964, ch. 95, new sections 94 through 100 were added to article 75 of the Code — the article dealing with "Pleadings, Practice and Process at Law". No change in, or reference to, the then-existing provisions of article 23, upon which the State's jurisdiction had theretofore been based, was made by this Act. In fact, in section 2 of the Act, the General

Assembly declared that "this [new] subtitle shall be deemed to be supplementary to any law of this State providing for personal jurisdiction over persons outside this State, and nothing contained shall repeal or modify any law of this State authorizing the exercise of jurisdiction on any basis other than the basis provided herein."

The new Act, after defining the word "person" to include a corporation, whether or not organized under the laws of this State, provided as follows:

"95. A court may exercise personal jurisdiction over a person domiciled in, organized under the laws of, or maintaining his or its principal place of business in, this State as to any cause of action.

"96. (a) A court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a cause of action arising from the person's

(1) transacting any business in this State;

(2) contracting to supply services in this State;

(3) causing tortious injury in this State by an act or omission in this State;

(4) causing tortious injury in this State by an act or omission outside the State if he regularly does or solicits business, engages in any other persistent course of conduct in this State or derives substantial revenue from food or services used or consumed in this State;

(5) having an interest in, using, or possessing real property in this State; or

(6) contracting to insure any person, property, or risk located within this State at the time of contracting.

(b) When jurisdiction over a person is based solely upon this section.

"97. When the exercise of personal jurisdiction is authorized by this subtitle, service may be made outside this State.

"98. When the court finds that in the interest of substantial justice the action should be heard in another forum, the court may stay or dismiss the action in whole or in part on any conditions that may be just.

"99. A court of this State may exercise jurisdiction on any other basis authorized by law.

"100. Service of process upon any person may, in addition to any other method allowed by law, be made in accordance with Chapter 100 of the Maryland Rules of Procedure or in such other manner as may hereafter be established by rule of the Court of Appeals of Maryland."

With respect to foreign corporations, this new Act created parallel bases of jurisdiction — one arising from the provisions in article 23, and the other arising from these new provisions in article 75. The Act itself was based upon Article I of the then recently approved (1962) Uniform Interstate and International Procedure Act.

Section 95, as then adopted, was identical to § 1.02 of the Uniform Act, and provided three alternative bases of *in personam* jurisdiction: domicile in the State, organization under the laws of the State, or maintenance of a principal place of business in the State. This was more restrictive than what was permitted under preexisting law under which jurisdiction was possible even where none of these three circumstances existed; but, in light of the expanded scope of jurisdiction permitted under § 96 (the general counterpart to § 1.03 of the Uniform Act), this was not thought to be a problem.[8]

---

8. The Commissioners' Comment to § 1.02 of the Uniform Act stated: "In view of the increased possibility of acquiring personal jurisdiction under section 1.03, it is unnecessary to subject a corporation to suit on any cause of action or claim for relief in the many states in which it may be 'doing business.' In this respect section 1.02 restricts somewhat the jurisdiction some states have purported to exercise over foreign corporations which do business in the state but do not there maintain their principal place of business."

The relationship between the parallel or alternative bases of jurisdiction spread between articles 23 and 75 came before the Court of Appeals in *Gilliam v. Moog Industries,* 239 Md. 107 (1965); but the Court addressed only part of the issue. A non-resident plaintiff sued a foreign corporation, which apparently had not qualified in Maryland and therefore had not appointed a resident agent, on a contract made in Missouri. Process was served on the Department of Assessments and Taxation pursuant to the relevant provisions in article 23.[9]

From the factual circumstances in the case, the Court concluded that the defendant corporation (Moog) was not "doing business" in Maryland which, it concluded, was a pre-requisite to jurisdiction under the provisions of article 23, § 92.[10] The plaintiff/appellant then urged the Court to conclude that jurisdiction arose from the new provisions of article 75. The Court acknowledged the new statute, and said of it (239 Md. at 111):

"It seems clear that the purpose of the Legislature in enacting these new provisions was to give the courts of the State personal jurisdiction over all out of state persons and corporations which constitutionally could be reached as having had sufficient Maryland contacts, under the jurisdictional yardstick established by the Supreme Court in

---

**9.** Article 23 was revised and re-codified in 1951 (Laws of Md., 1951, ch. 135) without substantive change to these sections. They were renumbered, however. Additional renumbering occurred with the adoption of the 1957 Code. Section 92 became the section providing for the tripartite jurisdiction over foreign corporations (§ 118 as enacted in 1937); original § 119, requiring foreign corporations to qualify and appoint a resident agent, became § 90; and § 105, providing for service of process, became §§ 96 and 97 (§ 96 dealing with service on the corporation, § 97 dealing with service on the State Tax Commission, which later became the Department of Assessments and Taxation).

**10.** *Compare* Com. de Astral v. Boston Met. Co., 205 Md. 237 (1954) upholding the constitutionality of § 92 (d), which based jurisdiction on a contract made or acts done in the State whether or not the corporation was "doing business" in the State. That "doing business" was required for jurisdiction under the other provisions of § 92 — in particular § 92 (a) — was made clear in Feldman v. Thew Shovel Co., 214 Md. 387 (1957). This, of course, is what the statute itself provided.

cases such as [*International Shoe Co., McGee,* and *Hanson v. Denckla* [11]]."

Having so commented, the Court declined to consider whether and to what extent the new statute applied because (1) the cause of action arose prior to its taking effect, and (2) the applicability and effect of the statute had not been raised in or decided by the lower court. Instead, the court affirmed the dismissal of the action based solely upon the provisions in article 23, but without prejudice to appellant's filing a new action claiming jurisdiction under article 75.

In 1967, the General Assembly consolidated the parallel provisions concerning jurisdiction over foreign corporations. By Laws of Md., 1967, ch. 532, it repealed outright sections 92, 96, and 97 of article 23, and amended § 75B of article 75 dealing with service of process.[12] It did not, however, repeal § 90 of article 23, dealing with the requirement of registration and qualification by foreign corporations, in which section the predecessor statute to § 7-210 appeared.

After 1967, the sole bases of jurisdiction over corporations — domestic and foreign — were as provided in article 75, §§ 95 and 96. As then worded, § 95 was so limited — requiring that the principal place of business be located in Maryland — that it virtually faded from view in terms of suits against foreign corporations. Section 96 drew all the attention, and quickly became the only practical basis of jurisdiction over foreign corporations. As finally amended in 1971 (*see* footnote 12), it covered everything that had been permitted under the repealed sections in article 23, plus more; and, once its constitutionality was sustained,[13] all jurisdictional roads led to and emanated from it.

The dilemma we face here arose from what, if read literally, would have been perhaps the most sweeping and dramatic,

---

11. 357 U. S. 235 (1958).

12. In taking this action, the Legislature inadvertently eliminated the right of a Maryland resident to sue a foreign corporation upon a cause of action arising outside of Maryland. This was "corrected" by Laws of Md., 1971, ch. 769.

13. *See* Geelhoed v. Jensen, 277 Md. 220 (1976), and cases cited therein.

and yet the most silent and probably unwitting, change yet made by the General Assembly in this area. In 1973, the Legislature enacted the Courts article, a recodification of the laws relating to courts and judicial proceedings. What had formerly been article 75, § 95 — that by-passed backwater of State jurisdiction — was recodified as § 6-102 (a). The Revisor's Note says of this new section that "subsection (a) presently appears as Article 75, § 95."

This is not the case. As noted, § 6-102 (a) provides for personal jurisdiction as to any cause of action over a person *served with process* in the state. These words were *not* in the former law. They were apparently added by the Code Revision Commission subcommittee on Courts, although the minutes of the meeting of the subcommittee reflect no debate, discussion, or reasons given for the addition of that phrase. It was simply added to the draft of § 6-102 that then existed and that, prior to the addition, was more faithful to the source law. The amendment was approved without discussion (at least without discussion reflected in the minutes) by the full Commission at its meeting on June 7, 1973, and thus was included in the draft bill submitted to the Legislature. No further amendments were made, or apparently offered, to that section, which was enacted as submitted by the Code Revision Commission.

Compounding the somewhat misleading statement that subsection (a) "presently appear[ed]" in the law was this additional part of the Revisor's Note:

"Subsection (a) states the general rule that a state has jurisdiction over its residents and over non-residents served with process in the state as to any cause of action wherever it arose.

"Additional jurisdiction is conferred by § 6-103 which grants jurisdiction over a broader class of persons as to causes of action arising in Maryland."

With respect to individuals, the section as enacted probably did not change the law: If an individual is served with process in the State, absent some statutory or common law exemption, he is subject to the jurisdiction of the court. To

that extent, the Revisor's note purporting to state the "general rule" is not inaccurate. As to foreign corporations, however, it would purport to authorize jurisdiction over a foreign corporation whose only contact with the State of Maryland was its compliance with the qualification requirements then contained in article 23, and now contained in Title 7, Corporations and Associations article. If given that interpretation, the addition of that base of jurisdiction would, in effect, have repealed by implication the provisions of § 90 of art. 23 (current § 7-210),[14] and reintroduced into the law the concept of jurisdiction by "express" consent — a concept whose constitutionality had been seriously questioned and which, because of the constitutional doubt, had been deliberately discarded by the Legislature in 1941.

The question, then, is whether § 6-102 (a) may properly be read in so expansive a way. As in all cases in which there may be legitimate doubt as to the meaning of a statute, the legislative intent will control. Given the total legislative history and interpretative background set forth above, more significantly, given the Revisor's Comments making clear that no change in the then-current law was intended or contemplated, and, finally, in the absence of any reference to § 90 of art. 23, we have no doubt that, in enacting § 6-102 (a) as part of a Code-revision effort, the General Assembly did not intend to establish a policy inconsistent with § 90.

To conclude otherwise would be to disregard some very basic rules of statutory construction; namely:

(1) Statutes relating to the same subject matter should be read together harmoniously, so as to give effect to each.[15]

(2) Repeal by implication is not favored and will not be assumed.[16]

(3) A change in phraseology of a statute arising from a recodification will not ordinarily be construed to change the

14. When the Corporations and Associations article was adopted in 1975 (Laws of Md., 1975, ch. 311), as a continuing part of the code revision process, former § 90 of art. 23 became § 7-210 of the revised article.

15. *See* Board of Fire Comm'rs v. Potter, 268 Md. 285 (1973); City of Baltimore v. Clerk, 270 Md. 316 (1973).

16. *See* Comm'n on Med. Discipline v. Bendler, 280 Md. 326 (1977).

law itself unless the change is so radical that the intention of the legislature to change the law appears unmistakable.[17]

This is not to say, however, that § 6-102 (a) has no application, or that § 6-103 is the sole basis of jurisdiction over foreign corporations. That construction would be inconsistent with the intent clearly expressed both in § 6-102 (b) and § 6-103 (a) that neither section is to constitute an exclusive basis of jurisdiction.

We therefore conclude that service of process, in Maryland, upon a resident agent appointed by a foreign corporation will subject the corporation to State court jurisdiction if, in addition to the fact, and validity, of that service, it is shown that the corporation has sufficient contact with the State to make it constitutionally subject to suit here. Whether that criterion is satisfied may be determined by reference to § 6-103 (b). If the types of contacts enumerated there are constitutionally sufficient to subject a nonqualifying corporation to *in personam* jurisdiction upon less than "personal" service, surely they will suffice to establish such jurisdiction when "personal" service is effected. Thus, reading sections 6-102 and 6-103 together, we hold that *in personam* jurisdiction will exist with respect to a foreign corporation if service of process is validly effected upon its resident agent in Maryland *and* at least one of the jurisdictional criteria set forth in § 6-103 (b) is shown to exist.[18]

The pleadings filed in this case show, and appellee in large part concedes in its brief, that, in or about the relevant period here (1975), appellee had (1) as noted, qualified to do business in Maryland, (2) "occasionally bid on engineering jobs in Maryland", (3) actually done dredging work in Maryland in Ocean City (1975) and Smith Island (1976), (4) obtained a

**17.** *See* Bureau of Mines v. George's Creek, 272 Md. 143 (1974).

**18.** This construction is not inconsistent with § 7-210. Compliance with the qualification requirements would not, "of itself", suffice to establish the jurisdiction; nor would the jurisdiction be based upon a "consent to be sued" theory. The effect of reading §§ 6-102 and 6-103 together is to make inapplicable the requirement of § 6-103 (a) that the cause of action arise from an act enumerated in § 6-103 (b), since jurisdiction would not be based "solely upon [that] section." *See* Perkins v. Benguet Consolidated Mining Co., *supra,* 342 U. S. 437 (1952).

contractor's license from both the State and the City of Baltimore, and (5) paid a franchise tax of $10.00 and a personal property tax of $40.00, in 1975, to the State.

Upon this record, it is clear that appellee met, at least, the criteria set forth in § 6-103 (b) (1) and (2), if not 6-103 (b) (4) as well. Accordingly, we believe that the court below did have appropriate jurisdiction over appellee, and properly denied appellee's motion raising preliminary objection.[19] Its cross-appeal, therefore, is without merit.

We turn now to the question raised by appellant's appeal, the resolution of which requires an understanding of the nature of the cause of action for maintenance and cure.

Maintenance and cure is the right of a seaman who becomes injured or sick while in the service of a ship to food, lodging, and care, independent of any other right he may have to recover damages for negligence or unseaworthiness of the vessel. It is a right that has been said to be "as old as maritime law itself", and, though not created by statute, "has always been recognized 'under the laws of various times and peoples.' " *Dwyer v. Lehigh Valley R. Co.*, 34 A. 2d 235, 237 (N.J. 1943) *aff'd* 37 A. 2d 88 (1944), (Quoting from 56 C.J. p. 1066, § 582 *et seq.*); 79 C.J.S. *Seaman*, § 172. It is designed, said the Supreme Court in *Vaughan v. Atkinson,* 369 U. S. 527, 531, *reh. denied* 370 U. S. 965 (1962) "to provide a seaman with food and lodging when he becomes sick or injured in the ship's service; and it extends during the period when he is incapacitated to do a seaman's work and continues until he reaches maximum medical recovery."

The policy underlying this ancient duty on the part of the ship and its owner was expressed by Mr. Justice Story in *Harden v. Gordon,* Fed. Cas. No. 6047 (c.c.) and restated by the Supreme Court in *Calmar S.S. Corp. v. Taylor,* 303 U. S. 525, and in *Vaughan v. Atkinson, supra,* as follows:

"the protection of seamen, who, as a class, are poor, friendless and improvident, from the hazards of

19. Appellee did not raise the question of whether the court should have declined to exercise jurisdiction under § 6-104, and we therefore express no opinion as to that issue.

illness and abandonment while ill in foreign ports; the inducement to masters and owners to protect the safety and health of seamen while in service; the maintenance of a merchant marine for the commercial service and maritime defense of the nation by inducing men to accept employment in an arduous and perilous service." [20]

The duty to provide maintenance and cure is upon both the ship and its owner, and, although arising out of the employment relationship between the seaman and the shipowner, it is not purely a contractual obligation. As was said in *Cortes v. Baltimore Insular Line,* 287 U. S. 367, 371 (1932), and repeated in *Vaughan v. Atkinson, supra,* the duty "is imposed by the law itself as one annexed to the employment. . . . Contractual it is in the sense that it has its source in a relation which is contractual in origin, but given the relation, no agreement is competent to abrogate the incident."

When a seaman is denied the maintenance and cure to which he is entitled, he may sue for damages; and, although such actions are more frequently brought in the federal courts (often in conjunction with claims under the Jones Act [21] or for unseaworthiness), they are cognizable as well in the State courts, if jurisdiction over the parties is obtained. See *Jordine v. Walling,* 185 F. 2d 662 (3rd Cir., 1950); *Walker v. Ohio River Co.,* 205 A. 2d 43 (Pa., 1964); *Dwyer v. Lehigh Valley R. Co., supra.*

This is the nature of the action before us. Appellant was employed as a merchant seaman aboard the dredge

---

**20.** Some of the need implicit from these statements has, of course, been substantially alleviated through the development of marine hospitals, more extensive health programs for seamen, and more enlightened laws and practices governing the employment relationship between seamen and shipowners. The right to maintenance and cure has adjusted accordingly. Thus, a seaman hospitalized without expense in a marine hospital is not entitled to maintenance and cure for the period of his stay in the hospital (Calmar S.S. Corp. v. Taylor, *supra*); nor is the seaman who convalesces at the home of his parents, without incurring any expense or liability for his support, entitled to these payments. Johnson v. United States, 333 U. S. 46 (1948), *motion to recall mandate denied,* 333 U. S. 865 (1948).

**21.** 46 U.S.C. 688.

*Richmond,* owned and operated by appellee when, on August 12, 1975, he allegedly injured his back while moving an oil drum. As a result of this occurrence, and the alleged refusal of appellee to pay the maintenance and cure, appellant sued appellee in the District Court for Anne Arundel County (the case then being removed to the Circuit Court for that county by virtue of appellee's request for a jury trial) seeking to recover damages. One element of the damages sought by appellant was counsel fees.

At the conclusion of the evidence, appellant asked the court to give the following instruction to the jury: "A seaman who must file suit in order to recover maintenance and cure which has been unreasonably and arbitrarily denied by the owner of the vessel is entitled to payment of attorney's fees as well as interest and court costs." The court not only denied the request for that instruction, but gave no instruction at all with respect to counsel fees; and to that omission appellant duly excepted. The case was then submitted to the jury on three issues: (1) whether appellant suffered an injury; (2) whether the injury occurred in the service of the dredge *Richmond;* and (3) the period for which appellant was entitled to maintenance and cure. The jury answered the first two questions in the affirmative, and established the period of entitlement as being from "Aug 75 — Aug 76". Although not reflected on the document entitled "Issues" that was submitted to the jury, the record shows that the actual verdict was for $8.00 a day for the one year period.[22]

Appellant's claim is that he was entitled to recover counsel fees, as well as compensatory damages for the unpaid maintenance and cure, and that the court erred in failing to grant his requested instruction regarding counsel fees.

Although counsel fees are not ordinarily a recoverable element of damages in a civil action, it has been clear, at least

---

22. The docket entries show that judgment was entered for appellant and against appellee "for costs of suit", there being no indication that the jury's verdict of $8.00 a day was ever extended to judgment. Pre-trial pleadings show that appellee had paid maintenance and cure from August 12, 1975, (the date of the injury) through December 4, 1975, but had refused to provide the same thereafter.

since *Vaughan v. Atkinson, supra,* that they are recoverable in an action instituted in federal court for failure to provide maintenance and cure, at least where that failure results from a callous, willful, or recalcitrant attitude on the part of the shipowner. The majority Opinion in *Vaughan,* authored by Mr. Justice Douglas, is somewhat ambiguous as to whether counsel fees are recoverable automatically, in the discretion of the court, or only upon a showing of a callous, willful, or recalcitrant shipowner. *See* 369 U. S. at 530, 531, and the dissent by Justices Stewart and Harlan at pages 539, 540. *See also* Benedict on Admiralty, 7th Ed. Rev. Vol. 1 B, § 51, p. 4-81. The majority view appears to require a showing of callousness or recalcitrance. As stated in *Roberts v. S.S. Argentina,* 359 F. 2d 430 (2nd Cir., 1966):

> "With regard to the allowance of attorney's fees, we think that *Vaughan v. Atkinson, supra,* should be read to allow recovery of counsel fees only where the employer is shown to have been 'callous' or 'recalcitrant' in refusing to pay maintenance and cure when demanded by a seaman. Although one or two district courts have awarded counsel fees under a very broad interpretation of *Vaughan v. Atkinson, supra,* see Jordon v. Norfolk Dredging Co., 223 F. Supp. 79 (E.D. Va. 1963), the overwhelming majority of district courts have required a showing of callousness or recalcitrance in withholding maintenance and cure to support such an allowance. (citations omitted)"

This appears to be the view taken by the Federal District Court for Maryland, *Connorton v. Harbor Towing Corporation,* 237 F. Supp. 63 (D. Md., 1964), *aff'd* 352 F. 2d 517 (1965), as well as that taken in the more recent federal cases.[23] Moreover, it seems to be what the Supreme Court itself had in mind in *Vaughan* although admittedly its

---

23. *Compare, for example,* Seifried v. Mon River Towing, Inc., 388 F. Supp. 233 (W.D. Pa., 1974) with two older decisions from Louisiana, both authored by the same District judge — Stewart v. S.S. Richmond, 214 F. Supp. 135 (E.D. La., 1963), *appeal dismissed,* 326 F. 2d 208 (1964); Sims v. Marine Catering Service, Inc., 217 F. Supp. 511 (D. La., 1963).

intention could have been more clearly expressed.[24] Thus, we conclude that, in an action for damages resulting from the failure to provide maintenance and cure, counsel fees, as an element of those damages, are recoverable only upon a showing that, in refusing to provide the maintenance and cure the shipowner was callous, willful, or recalcitrant. A good faith belief that the seaman is not entitled to the maintenance and cure, or that he is not entitled to a continuation of that benefit beyond a certain point, notwithstanding that such belief is not ultimately shared by a court or jury, will not suffice to support an award of counsel fees.

In judging whether the court's refusal to grant appellant's requested instruction with respect to counsel fees amounted to reversible error, we are guided by the principle that a litigant is entitled to have his theory of the case presented to the jury, through an appropriate instruction, if, *and only if,* it is a correct exposition of law *and* there is evidence in the case that supports it. *Levine v. Rendler,* 272 Md. 1 (1974). The requested instruction, though expressing the right to counsel fees in terms of the unreasonableness and arbitrariness of the shipowner, rather than using the magic words "callous", "willful", or "recalcitrant" from *Vaughan,* was nevertheless a basically correct exposition of the law. The decisive question, then, is whether there was any evidence in the

---

**24.** The sentiment that led the Court to permit the award of counsel fees in that case was expressed primarily in this passage of the Opinion: "In the instant case respondents were callous in their attitude, making no investigation of libellant's claim and by their silence neither admitting nor denying it. As a result of that recalcitrance, libellant was forced to hire a lawyer and go to court to get what was plainly owed him under laws that are centuries old. The default was willful and persistent. It is difficult to imagine a clearer case of damages suffered for failure to pay maintenance than this one." 369 U. S. at 530-31. *See also* the dissenting opinion of Chief Judge Sobeloff in the same proceeding before the Fourth Circuit Court of Appeals, which was largely adopted by the Supreme Court. Vaughan v. Atkinson, 291 F. 2d 813 (4th Cir., 1961). On remand from the Supreme Court to determine the appropriate measure of damages, the United States District Court construed the High Court's mandate this way (Vaughan v. Atkinson, 206 F. Supp. 575 (E.D. Va., 1962)): "This court does not construe the Supreme Court opinion as automatically requiring the payment of damages by way of attorney's fees *in all cases* where maintenance claims are presented. There may be valid reasons for not voluntarily paying a claim for maintenance — as long as the shipowner acts equitably with a *bona fide* desire to comply with the law and provide maintenance which is justly and obviously due, damages by reason of an honest dispute will not necessarily be allowable."

record from which the jury could have found that appellee's failure to provide the maintenance and cure was, in fact, unreasonable or arbitrary.

After a careful examination of the record, we find that the evidence was not sufficient to permit the jury to find that the actions of the shipowner were unreasonable or arbitrary, and, consequently, it did not suffice to support the requested instruction.

The alleged injury occurred when appellant attempted to move an oil drum, weighing several hundred pounds, into the engine room of the ship. This occurred sometime in August, 1975, while the dredge was working on a shoal near Swansboro, North Carolina, although the exact day and date are in some dispute. Appellant stated that directly after sustaining this injury, he told the captain and the chief engineer that he "thought" he hurt his back, but that he received no medical treatment at that time. The captain stated that he asked appellant whether he wanted to go to the emergency room, which was not far away, and that appellant replied, "No, nothing like that. I'll be alright." The offer of immediate medical care was confirmed by the chief engineer, and was not disputed by appellant.[25] Both the captain and the chief engineer testified that appellant then returned to work, although appellant stated that he had to lie down and take aspirin, and was unable to work.

According to the captain and the chief engineer, appellant remained on board, without further complaint as to a back injury, for another two weeks or so, at which point the dredge finished its work in Swansboro. Most of the crew, including appellant, was then laid off, and the dredge moved up to Hopewell, Virginia to start another job. When the dredge reached Norfolk, on its way to Hopewell, the captain called appellant back, and appellant rejoined the dredge in Norfolk. When the dredge reached Hopewell, some of the crew,

25. Appellant testified that the captain did not offer to *take* him to a doctor and did not *tell* him to go to a doctor. He stated further that neither the captain nor the chief engineer asked if appellant wanted medical care "the next day". But he did not claim either that he asked for medical assistance, or that it was not offered when he first mentioned the injury to the captain and the chief engineer.

including appellant, went on strike. Appellant then advised the captain that he would be unable to stay in Hopewell without working, and that he intended to return to North Carolina. It was at that point that appellant asked for an "accident report" to take with him to North Carolina. According to the captain, appellant "never said anything to me about the back injury, not a doctor or anything from the time on Sunday he told me [the date the alleged injury occurred] until he left Hopewell. . . . He kept on working and I never heard any more about it, from none of the crew or him." Apparently in the belief that appellant had not sustained an injury and also because, according to the captain, it was not necessary, in any event, to have an accident report in order to get medical care, the captain refused to give appellant an accident report.

Except for appellant's assertion that he was unable, for some period directly after sustaining the injury, to carry on his normal duties, none of this testimony, coming primarily from the captain but confirmed in most respects by the chief engineer, was disputed by appellant. Appellant conceded that, although he was under a doctor's care for ulcers and other ailments, he did not seek medical attention for his back injury. until he returned to North Carolina, after having left both the dredge and appellee's employ in Hopewell.[26] It was then that he reported the injury to his family doctor, who put him in the hospital and placed him in traction. This was, by all accounts, two to three weeks after the occurrence — sometime in September, 1975.

It is not clear when a demand for maintenance and cure was first made; but, as already noted, it appears from appellant's answers to interrogatories and from appellee's motion *in limine,* both included as part of the record, that appellee paid maintenance and cure at the prevailing rate of $8.00 a day for a period commencing August 12, 1975, through December 4, 1975. There is nothing in the record — not in the testimony or evidence adduced at trial and not in any of the pre-trial

---

**26.** As noted, appellant had returned to his home for a few days after the injury and before rejoining the dredge in Norfolk, but he sought no medical assistance at that time.

pleadings — to show why the payments terminated as of December 4, 1975.

It was, of course, appellant's burden to prove his claim. With respect to his claim for counsel fees, it was therefore incumbent upon him to produce sufficient evidence to establish that appellee's termination of maintenance and cure as of December 4, 1975, was arbitrary and unreasonable. This, he clearly failed to do. Perhaps because of the motion *in limine* filed by appellee (to which the record discloses no objection by appellant), there was no evidence presented that appellee had paid anything; and the case proceeded, and was argued, upon the premise that no maintenance and cure had been provided. In light of the fact that payments had, in fact, been made, and that the reasons (or lack thereof) for terminating payment were critical to the proper adjudication of appellant's claim to counsel fees, it may well be that the court should not have granted the motion *in limine.* That issue, however, has not been raised in this appeal, and is therefore not before us. We are simply left with the fact that appellant failed to produce any evidence at all as to why maintenance and cure was terminated. Indeed, as noted, the jury never knew that it *was* terminated, because it never knew that any had been provided.

Because of this total void, there was no factual basis upon which the jury could have adjudged the actions of appellee to have been reasonable or unreasonable. Thus, the requested instruction was unsupported by any evidence, and, for that reason, was properly denied.

> *Judgment affirmed; costs to be divided equally between the parties.*